FILED
CLERK PAMELA MISHLER FISH
2008 AUG 26 AM 8:40
PORTER CIRCUIT AND SUPERIOR COURTS

STATE OF INDIANA ) ) SS: COUNTY OF PORTER )

IN THE PORTER SUPERIOR COURT
CONTINUOUS TERM, 2008

ARCELORMITTAL BURNS HARBOR LLC, a Delaware limited liability company; ARCELORMITTAL WARREN INC., a Delaware Corporation; and ARCELORMITTAL DOFASCO INC, a Canadian Corporation,

Plaintiffs,

vs.

BLUESTONE COAL CORPORATION, a West Virginia corporation; and BLUESTONE COAL SALES CORPORATION, a Delaware corporation,

Defendants.

No. 64D05-C808-PL-8184

Judge

## COMPLAINT

Plaintiffs ArcelorMittal Burns Harbor LLC ("AM Burns Harbor"); ArcelorMittal Warren, Inc, f/k/a ISG Warren Inc. (collectively "AM Warren"), and ArcelorMittal Dofasco Inc. ("AM Dofasco"), by and through their attorneys, hereby complain against Defendants Bluestone Coal Corporation ("Bluestone Coal") and Bluestone Coal Sales Corporation ("Bluestone Sales") (collectively, "Bluestone") as follows:

## NATURE OF ACTION

1. AM Burns Harbor, AM Warren and AM Dofasco (collectively "the AM Plants") are part of the ArcelorMittal international group of companies ("ArcelorMittal") whose business is making steel. The AM Plants make coke, a form of carbon that is a key ingredient in steel making, and supply that coke to ArcelorMittal steel mills, including the AM Burns Harbor steel mill. The AM Plants make coke twenty four hours a day, seven days a week, three hundred

sixty five days a year. This continuous operation is essential to prevent damage to the coke ovens which are designed to run at a constant temperature of 2300° F. If the coke plant cannot maintain appropriate oven temperatures, the ovens are at risk of catastrophic failure due to "thermal shock."

2. Coke is made from a special type of coal called "metallurgical coal." It is called metallurgical coal because it is the only type of coal suitable for making metals like steel. Metallurgical coal is scarcer and commands a higher price than other more abundant types of coal which are unsuitable for steel making. Bluestone is a key AM Plant supplier of substantial quantities of metallurgical coal. A consistent supply of metallurgical coal is essential to continuous coke production. Without that metallurgical coal, no coke can be made for steel making operations. Moreover, each coke plant operator blends different grades of metallurgical coal in order to achieve necessary coke quality while preserving the coke ovens, making it necessary to have on hand a consistent supply of each of the various types of metallurgical coal. The wrong mix of coal grades can result in poorer quality coke or produce pressure fatigue that can materially shorten the useful life of the coke ovens. It is therefore common knowledge among metallurgical coal producers that coke plants are critically reliant upon a steady, reliable source of metallurgical coal.

3. Given this critical need for metallurgical coal, the AM Plants entered into contracts with Bluestone for an agreed quantity, at an agreed price, to be delivered on an agreed schedule over an agreed period of time. Bluestone's coal delivery performance began to worsen in early 2008. As the market price of metallurgical coal rose, Bluestone's deliveries slowed to a trickle and, in the case of AM Burns Harbor and AM Dofasco, have stopped altogether. To date, the AM Plants have taken all reasonable steps to secure metallurgical coal from alternative

sources, at significantly higher prices, to make up for the metallurgical coal Bluestone promised to deliver but has not. ArcelorMittal has also purchased coke to replace coke the AM Plants would have produced had Bluestone honored its contracts by supplying metallurgical coal. Because the AM Plants have incurred significant damages and will suffer immediate and irreparable harm if they are unable to continue to obtain a timely supply of metallurgical coal from sources other than Bluestone, they have brought this lawsuit to require Bluestone to perform its contracts and pay the damages incurred by the AM Plants in securing alternative metallurgical coal at significantly higher prices.

**THE PARTIES AND THEIR AFFILIATES**

4. ArcelorMittal Burns Harbor LLC, formerly known as ISG Burns Harbor LLC, is a Delaware limited liability company with it principal place of business at 250 West US Highway 12, Burns Harbor, Indiana 46304.

5. ArcelorMittal Warren Inc., formerly known as ISG Warren Inc., is a Delaware corporation with its principal place of business at 2234 Main Avenue SW, Warren, Ohio 44481.

6. ArcelorMittal Dofasco Inc. is a Canadian company with its principal place of business at 1330 Burlington St. E, Hamilton, Ontario, Canada.

7. Bluestone Coal Corporation is a West Virginia corporation with its principal place of business at 818 North Eisenhower Drive, Beckley, West Virginia 25801. Bluestone Coal Corporation is in the coal mining business. Bluestone Coal Sales Corporation is a Delaware corporation with its principal place of business at 818 North Eisenhower Drive, Beckley, West Virginia 25801. Bluestone Coal Sales Corporation holds itself out as being in the coal mining business with 800 employees and sales of $350 million.

## JURISDICTION AND VENUE

8. Pursuant to Ind. R. Trial Proc. 22 (B), this court has jurisdiction over all claims and all parties joined in this action.

9. Bluestone Coal Corporation and Bluestone Coal Sales Corporation are subject to personal jurisdiction because both regularly conduct and transact business in Indiana, including the conduct and transaction of business with the AM Plants regarding the subject matter of this action. Ind. R. Trial Proc. 4.4.

10. Pursuant to Ind. R. Trial Proc. 20, all plaintiffs assert rights arising out the same series of transactions, and questions of law or fact common to all plaintiffs will arise in the action.

11. Venue is proper in Porter County pursuant to Ind. R. Trial Proc. 75 because at least one plaintiff resides in Porter County.

## COMMON ALLEGATIONS

12. Plaintiffs AM Plants incorporate by reference the allegations of Paragraphs 1 through 11 above as if set forth herein in their entirety.

**A. The Coke Plants.**

13. The AM Burns Harbor coke plant consists of two coke oven batteries, each containing 82 ovens, a coal handling unit, a coal chemical unit, and a coke screening operation. The coke plant employs approximately 275 people and produces over 4,800 tons of coke each day (nearly 1,752,000 tons annually) for use in blast furnaces in the AM Burns Harbor steel mill. The AM Burns Harbor coke plant has a replacement cost of more than $300 million, and consumes more than 2.45 million tons of metallurgical coal each year.

14. The AM Warren coke plant consists of one coke battery with 85 ovens. The coke plant employs approximately 150 people and produces over 1,500 tons of coke each day (nearly

550,000 tons annually) for use in blast furnaces in the AM Warren steel mill. The AM Warren coke plant has a replacement cost of more than $170 million, and consumes more than 750,000 tons of metallurgical coal each year.

15. AM Dofasco has three coke production facilities consisting of six coke batteries with a total of 245 ovens. The coke plants employ approximately 363 people and produce over 1.18 million tons of coke annually for use in blast furnaces in the AM Dofasco steelmaking facility. The AM Dofasco coke plant has a replacement cost of more than $490 million, and consumes more than 1.8 million tons of metallurgical coal each year.

**B. The AM Plants – Bluestone Coal Purchase Contracts.**

**1. AM Burns Harbor.**

16. In November 2006, representatives from Bluestone, including Bluestone Coal President James C. Justice, II, and Bluestone Coal Vice President Thomas Lusk, traveled to Hammond, Indiana for a meeting with ArcelorMittal. Bluestone already had pre-existing or prior business relationships with various ArcelorMittal entities. A principal purpose of the meeting was for ArcelorMittal to identify additional opportunities available to coal suppliers for growing their business to supply the global coal needs of ArcelorMittal. Consistent with that goal, the Bluestone officers met with Franz Blancquaert and Liem Hazoumé, ArcelorMittal's global Corporate Purchasing representatives from Europe, and with Herbert Lewis, ArcelorMittal's Manager, Coal Sourcing based in Indiana.

17. In late October 2007, Bluestone representatives again traveled to meet with ArcelorMittal personnel, at the ArcelorMittal offices in Burns Harbor, Indiana, to further explore the opportunities for Bluestone to supply ArcelorMittal's global needs for coal. Bluestone's representatives again included Bluestone Coal President James C. Justice II, and Vice President Tom Lusk, and Tim Hall and Dan Hendrickson of Bluestone Coal Sales. Consistent with the

global scope of the coal needs being addressed, ArcelorMittal was represented at the meeting by Liem Hazoumé, ArcelorMittal's global corporate purchasing representative, AM Warren's purchasing representatives Jeff Foster and Bill Sullivan, AM Dofasco's purchasing representative Jim Wilson and ArcelorMittal purchasing representatives William J. Sammon and Herbert Lewis from Indiana. Bluestone made a sales presentation to the entire group, including use of a video. As part of that presentation, Mr. Justice referenced shortcomings in Bluestone's previous performance as a coal supplier to the AM Plants and gave assurances that those shortcomings would not recur. As a result of this meeting, the ArcelorMittal and Bluestone representatives began negotiations for metallurgical coal supply agreements for AM Burns Harbor, AM Dofasco and for the export of coal to ArcelorMittal facilities in Europe. The agreements under negotiation were for the years 2008 and beyond.

18. On December 1, 2007, ArcelorMittal's Liem Hazoumé sent an email to Bluestone's Jim Justice to reconfirm the AM Burns Harbor deal for mid vol coal. On December 4, 2007, Mr. Justice responded to Mr. Hazoumé stating "[p]ursuant to your request, we are pleased to confirm all of our upcoming business as outlined in your December 1, 2007 e-mail." For AM Burns Harbor, Mr. Justice's email confirmed the quantity of metallurgical coal, the price, the type of metallurgical coal, the annual delivery total, and the duration of the agreement. On December 5, 2007, Mr. Hazoumé responded "[a]ppreciate your confirmation" and stated his assumption that "your confirmation is extended to all terms mentioned in my emails…." (True and correct copies of the December 1, December 4, and December 5, 2007 emails are attached hereto as Exhibit A, the "AM Burns Harbor-Bluestone Contract.") Mr. Justice did not respond to Mr. Hazoumé's December 5 email. AM Burns Harbor then produced a Purchase Order consistent with the terms of the AM Burns Harbor - Bluestone Contract. (A true and correct

copy of that Purchase Order is attached as Exhibit B.) AM Burns Harbor ordered coal for delivery. Bluestone issued invoices for the coal sold and delivered, and AM Burns Harbor paid those invoices.

19. The AM Burns Harbor – Bluestone Contract and Purchase Order were once amended, by agreement of the parties, to raise the price per ton as the result of Bluestone's demand that AM Burns Harbor agree to the increase as a condition to Bluestone signing a separate agreement with ArcelorMittal for the export of Bluestone coal. (A true and correct copy of the amendment is attached hereto as Exhibit C, the AM Burns Harbor Amendment.")

20. Although Bluestone delivered coal under the terms of the AM Burns Harbor – Bluestone Contract and the Amendment, its performance progressively worsened throughout 2008 supplying less coal than it had contracted to timely provide to AM Burns Harbor. AM Burns Harbor placed and continues to place orders for coal consistent with the terms of the AM Burns Harbor – Bluestone Contract, and Amendment. On August 5, 2008, Bluestone advised ArcelorMittal's William Sammon that "we will no longer ship the Burns Harbor tons."

**2. AM Warren.**

21. AM Warren has purchased metallurgical coal from Bluestone for over 20 years. The most recent contract between them became effective January 1, 2006, and was later amended. (The "AM Warren – Bluestone Contract" to be attached as Exhibit D.) That agreement was signed by Bluestone in Indiana. The AM Warren- Bluestone Contract identifies the quantity of metallurgical coal, the price, the type of metallurgical coal, the annual delivery total, and the duration of the agreement. As is evident from the context and pagination, page 17 of the AM Warren – Bluestone Contract was inadvertently omitted from the executed contract. (The true and correct content of page 17 is added to Exhibit D, as an "Addendum.")

22. AM Warren has and continues to place orders for coal consistent with the Warren - Bluestone Contract and consistent purchase orders. Bluestone invoices AM Warren for coal sold and delivered, and AM Warren has paid those invoices.

**3. AM Dofasco.**

23. On December 1, 2007, ArcelorMittal's Liem Hazoumé sent an email to Bluestone's Jim Justice to reconfirm the AM Dofasco deal for low vol coal. On December 4, 2007, Mr. Justice responded to Mr. Hazoumé stating "[p]ursuant to your request, we are pleased to confirm all of our upcoming business as outlined in your December 1, 2007 email." For AM Dofasco, the email confirmed the quantity of metallurgical coal, the price, the type of metallurgical coal, the annual delivery total, and the duration of the agreement. On December 5, 2007, Mr. Hazoumé responded "[a]ppreciate your confirmation" and stated his assumption that "your confirmation is extended to all terms mentioned in my emails...." (True and correct copies of the December 1, December 4, and December 5, 2007 emails are attached hereto as Exhibit E, the "AM Dofasco – Bluestone Contract.") Mr. Justice did not respond to Mr. Hazoumé's December 5 email. Consistent with and in reliance on the AM Dofasco – Bluestone Contract, AM Dofasco on March 10, 2008 issued its Purchase Order Z00012689. ("AM Dofasco Purchase Order" attached as Exhibit F.) The AM Dofasco Purchase Order was amended on June 11, 2008, to reflect a Bluestone demanded price increase. ("AM Dofasco Purchase Order Amendment #1," attached as Exhibit G.)

24. The AM Dofasco Purchase Order and AM Dofasco Purchase Order Amendment #1 both designate Bluestone as "a key supplier of Coal (a quality-critical material), [and Bluestone] is required to meet 100% On Time Delivery Performance Requirements." Bluestone is to supply approximately 360,000 net tons of "low vol" type metallurgical coal over the three year period 2008-10, 120,000 net tons per year, with an AM Dofasco option to purchase an

additional 120,000 net tons per year in each of 2009 and 2010. The coal is to be delivered under a "firm shipment" schedule for 2008 with specific quantities identified to be shipped each month. The price per net ton, FOB railcar the mine, is set for 2008, with a formula for adjustment in succeeding years. As an aid to AM Dofasco's enforcement of Bluestone's obligations, AM Dofasco may inspect Bluestone's facilities for any reasonable purpose in connection with that agreement.

25. AM Dofasco placed and continues to place orders for coal consistent with the terms of the AM Dofasco - Bluestone Contract, AM Dofasco Purchase Order and AM Dofasco Purchase Order Amendment #1. Bluestone has issued invoices for the coal sold and delivered, and AM Dofasco has paid those invoices.

**C. Bluestone's Failure To Timely Deliver Coal**

26. In late winter and early spring of 2008, domestic and international metallurgical coal prices began to rise dramatically due to the increased demand for coke to make steel and the flooding of significant metallurgical coal fields in Australia which adversely affected supply. The per ton price of the metallurgical coal identified for sale under the AM Burns Harbor, AM Warren and AM Dofasco contracts with Bluestone are, and for some time have been, below the market price for that metallurgical coal.

27. As the market price for metallurgical coal increased, Bluestone began severely curtailing its delivery of coal to the AM Plants. As of July 31, 2008, Bluestone has delivered only 50% of the metallurgical coal to have been delivered to AM Burns Harbor; only 60% of the metallurgical coal to have been delivered to AM Warren; and only 28% of the metallurgical coal to have been delivered to AM Dofasco.

28. After receiving confirmation from Bluestone that a specified quantity of coal is available on a date certain, the AM Plants initiate the "permit process" with a railcar provider.

29. AM Plants secure "permits" with the railcar provider for the specified number of railcars and are given permit numbers for the reserved railcars.

30. AM Plants communicate the permit numbers to Bluestone, enabling Bluestone to request the railcars to the load-out facility at its mine by using the ArcelorMittal permit numbers.

31. AM Plants, including AM Dofasco, have consistently obtained permits, from the railroad serving the Bluestone mines, for the delivery of empty railcars to be loaded with Bluestone metallurgical coal for delivery to AM Plants. AM Dofasco is informed and believes that there have been instances in which, although those railcars were filled with Bluestone metallurgical coal and became the property of AM Dofasco upon loading, neither the coal nor the railcar were delivered to AM Dofasco. Instead, using AM Dofasco's permit-supplied railcars, Bluestone directed the railroad to deliver the coal filled railcars elsewhere. AM Dofasco is informed and believes that Bluestone is diverting AM Dofasco's metallurgical coal to other customers who are willing to pay more than AM Dofasco's contract prices.

32. ArcelorMittal representatives, including Liem Hazoumé, Bill Sammon and Tom Zendzian on behalf of AM Burns Harbor, Bill Sullivan for AM Warren, and Rocco Simonelli and Danielle Lewis for AM Dofasco, have made repeated requests to Bluestone that the metallurgical coal for which AM Plants contracted be timely delivered pursuant to the terms of Bluestone's contracts with AM Plants.

33. Bluestone has not delivered metallurgical coal to AM Dofasco since May 27, 2008.

**D. The Impact of Bluestone's Failure to Timely Deliver Coal.**

34. As a result of Bluestone's failure to timely deliver the coal required under each of the AM Plants coal purchase agreements, AM Plants are experiencing coal shortages that

increase the cost of steel making and expose the AM Plants coke facilities to the risk of catastrophic failure due to thermal shock.

35. Existing AM Plants' metallurgical coal inventories have plummeted. AM Burns Harbor and AM Warren each require a summer inventory of 20 days, and 25 days of inventory in the winter months for each grade of metallurgical coal. The winter inventory increase is required because of the significantly increased difficulty of unloading coal in cold weather. Consequently, the summer months are used to build critical inventory as winter approaches. Inventory building is particularly critical for AM Dofasco because ships are used on the last leg of the coal's journey, and the Great Lakes shipping season typically ends in November and does not resume until April. AM Dofasco therefore requires a coal inventory for each grade of metallurgical coal from 90 to 120 days.

36. AM Burns Harbor has already had to cut back its coke production levels and change its blend of metallurgical coal numerous times in order to compensate for the lack of Bluestone deliveries. The adverse effects include lost coke production and a loss in coke yield.

37. AM Dofasco has already had to change its blend of coal numerous times in order to compensate for the lack of timely Bluestone deliveries. The result is production of sub-optimal coke, which increases cost.

38. ArcelorMittal facilities have had to purchase metallurgical coal, when available, at prices significantly above the contract prices.

39. ArcelorMittal facilities have also had to secure coke, to replace the coke that the AM Plants would have otherwise produced from the coal Bluestone should have but failed to deliver. These coke purchases were necessary to keep the steel mills running according to

business plan levels. ArcelorMittal facilities purchased the substitute coke at prices substantially higher than AM Plants' cost of producing the coke.

40. AM Plants have been forced to purchase cover coal of a composition that is sub-optimal when compared with the composition of the metallurgical coal that Bluestone is required to deliver.

41. ArcelorMittal is increasingly approaching the limits of its ability to continue to cover the shortfall in Bluestone coal deliveries. This situation will be exacerbated by Bluestone's recent notice to AM Burns Harbor that it will no longer ship it any coal.

**COUNT I**
**(Breach of Contract – AM Burns Harbor)**

42. Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 41 above as if set forth herein in their entirety.

43. The AM Burns Harbor – Bluestone Contract, the Purchase Order, the AM Burns Harbor Amendment, and the course of dealing and course of performance between those parties obligated Bluestone to timely deliver mid vol metallurgical coal to AM Burns Harbor.

44. Bluestone materially breached its contract obligations by repeatedly failing to timely deliver all of the mid vol metallurgical coal required for the operation of AM Burns Harbor.

45. AM Burns Harbor has been substantially injured as a result of Bluestone's repeated breaches.

46. AM Burns Harbor has performed all of its contract obligations.

**COUNT II**
**(Breach of Contract - AM Warren)**

47. Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 46 above as if set forth herein in their entirety.

48. The AM Warren - Bluestone Contract and the course of dealing and course of performance between those parties obligated Bluestone to timely deliver low vol metallurgical coal to AM Warren.

49. Bluestone materially breached its contract obligations by repeatedly failing to deliver all of the low vol metallurgical coal required by AM Warren plant.

50. AM Warren has been substantially injured as a result of Bluestone's repeated breaches.

51. AM Warren has performed all of its contract obligations.

**COUNT III**
**(Breach of Contract - AM Dofasco)**

52. Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 51 above as if set forth herein in their entirety.

53. The AM Dofasco - Bluestone Contract, AM Dofasco Purchase Order, Amendment No. 1, and the course of dealing and course of performance between the parties obligated Bluestone to timely deliver low vol metallurgical coal to AM Dofasco.

54. Bluestone materially breached its contract obligations by repeatedly failing to timely deliver all of the low vol metallurgical coal required by the AM Dofasco plant.

55. AM Dofasco has been substantially injured as a result of Bluestone's repeated breaches.

56. AM Dofasco has performed all of its contract obligations.

**COUNT IV**
**(Conversion - AM Dofasco)**

57. Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 56 above as if set forth herein in their entirety.

58. AM Dofasco secured permits for railcars from a third-party railroad sufficient to transport the low vol coal it ordered from Bluestone to Sandusky, Ohio for vessel shipment to AM Dofasco.

59. Bluestone ordered railcars to its mine based upon AM Dofasco's railcar permits.

60. Bluestone loaded coal onto railcars secured by AM Dofasco's permits.

61. Under the terms of the Dofasco Purchase Order and Amendment No. 1, metallurgical coal loaded onto railcars under AM Dofasco secured permits became, at the time of loading, the property of AM Dofasco.

62. On information and belief, once coal was loaded onto the railcars secured by AM Dofasco's permits, Bluestone diverted the railcars and coal to customers other than AM Dofasco.

63. On information and belief, Bluestone deliberately and knowingly diverted to other customers metallurgical coal belonging to AM Dofasco.

64. AM Dofasco has sustained injury as a result of Bluestone's actions of delivering to other customers the coal belonging to AM Dofasco.

**JURY DEMAND**

Plaintiffs respectfully request a trial by jury on all issues triable to a jury.

WHEREFORE, AM Burns Harbor, AM Warren and AM Dofasco hereby demand judgment against defendants as follows:

A. Monetary damages according to the proof;

B. Punitive damages on the Conversion claim; and

C. Such other and further relief as this Court deems just and equitable.

Dated: August 25, 2008

Respectfully submitted,

ARCELORMITTAL BURNS HARBOR, LLC, ARCELORMITTAL WARREN INC., AND ARCELORMITTAL DOFASCO INC.,

By: Larry G. Evans
One of Their Attorneys

Richard J. Gray
Elizabeth A. Coleman
JENNER & BLOCK LLP
330 N. Wabash Avenue
Chicago, IL 60611
Telephone: 312 222-9350
Facsimile: 312 527-0484

Larry G. Evans
HOEPPNER WAGNER & EVANS LLP
Twin Towers
1000 E. 80th Place, Sixth Floor
P.O. Box 10627
Merrillville, Indiana 46411-0627
Telephone; 219 769-6552
Facsimile: 219 738-2349

# EXHIBIT A

**From:** HAZOUME Liem
**Sent:** Saturday, December 01, 2007 4:54 PM
**To:** Jim Justice
**Cc:** 'solidfuels@arcelormittal.com'; 'Tim Hall'; 'Dan Hendrickson'; 'solidfuels@arcelormittal.com'; Sammon, William J.
**Subject:** To Jim: Bluestone MV for Burns Harbors

Dear Jim,

Following our discussion last Friday, I hereby confirm that we have agreed to following main terms

- Quality: Bluestone MV coal (Red Fox)
- Quantity: 400kt (combination of previously agreed tonnage + additional tons)
- Term: 2 years (Jan – Dec 2008 for Year 1 and Jan-Dec 2009 for Year 2)
- Price Year 1: $98, FOB mine
- Price Year 2: to be agreed between +/- $5 from nominal price of $95

Other terms
- Quality parameters

| | Min | Typical | Max | Price adjustment level | Reject Limit | Penalty |
|---|---|---|---|---|---|---|
| Moisture | 6.00 | 7.00 | 8.00 | 7.75 | 9.50 | $1.00 per 1.0% above max - prorated |
| Volatile | 23.00 | 24.00 | 25.00 | 25.00 | 27.0 | $2.00 per 1.0% above max - prorated |
| Ash | 6.00 | 6.50 | 7.00 | 7.25 | 8.50 | $3.00 per 1.0% above max - prorated |
| Sulfur | 0.80 | 0.85 | 0.90 | 0.95 | 1.05 | $2.00 per 0.1% above max - prorated |
| Reflectance | 1.21 | 1.23 | 1.25 | na | <1.20 or > 1.27 | na |
| Oxidation | 95.00 | 97.00 | 100.00 | na | 92.00 | na |

- Other quality parameters to comply with typical analysis
- Vitrinite distribution – normal distribution about the mean (ie no bimodal distribution)
- Oxidation – Microscopic analysis of oxidized coal particles shall be zero
- Coal shipments will be evenly distributed on a yearly basis (ie average 3.3 trains per month)

As we will take exactly the same MV coal, I suggest basing our export contract on same quality parameters.
For sake of good order and before going for upper management approval, I would be grateful if you could confirm above terms, so that we are on same line.

Thank you once again for this business Jim,

Best regards,

**Liem Hazoumé** | Lead Buyer

Corporate Raw Materials_SolidFuels (Coal & Coke) department
ArcelorMittal Purchasing

Purchasing | 1 à 5, rue Luigi Cherubini
F-93200 Saint-Denis - France
T +33 1 71 92 08 40 | M +33 6 14 61 23 51 | www.arcelormittal.com

Personal email : liem.hazoume@arcelormittal.com
Team email: solidfuels@arcelormittal.com

**From:** Jim Justice [jim@bluestoneindustries.com]
**Sent:** Tuesday, December 04, 2007 3:49 PM
**To:** HAZOUME Liem

Liem,

Pursuant to your request, we are pleased to confirm all of our upcoming business as outlined in your December 1, 2007 e-mail.

Arcelor Mittal - Export
20,000 metric tons Bluestone MV Coal December 2007 @ $91.75 per net ton 360,000 net tons Bluestone MV Coal April 2008 - March 2009 @ $90 per net ton 360,000 net tons Bluestone MV Coal April 2009 - March 2010 with price TBN

Arcelor Mittal - Dofasco
120,000 net tons per year Bluestone LV Coal 2008 - 2010 @ $81.72 per net ton for 2008 with a +/- $5 price collar for 2009 and 2010. There is a mutual option for up to 110,000 additional tons in 2009 and 2010 with the option to be declared by August of the preceding year.

Arcelor Mittal - ISG/Burns Harbor
400,000 net tons per year Bluestone MV Coal @ $98 per net ton in 2008 with a
+/- $5 price collar for 2009 to be calculated from a base price of $95
+per
net ton

Arcelor Mittal - Sun Coke Energy (Confirms Jeff Wozek's November 30, 2007
e-mail)
60,000 net tons Bluestone LV Coal November 2007 - February 2008 @ $88.90 per net ton 120,000 net tons per year Bluestone LV Coal 2008 - 2009 @ $88.90 per net ton with a +/- $5 price collar for 2009 300,000 net tons per year Bluestone MV Coal 2008 - 2009 @ $87.55 per net ton in 2008 with a +/- $5 price collar for 2009

We hope this confirmation is sufficient to your needs.

We are very grateful for your business, and I appreciate your friendship.

Thanks again,

Jim

**From:** HAZOUME Liem
**Sent:** Wednesday, December 05, 2007 1:02 AM
**To:** jim@bluestoneindustries.com
**Cc:** 'solidfuels@arcelormittal.com'; 'Tim Hall'; 'Dan Hendrickson'
**Subject:** To Jim: Bluestone 2008 deals MV and LV

**Attachments:** To Jim: Bluestone MV for Burns Harbors; To Jim: Bluestone mv export; To Jim: Reconfirmation of Dofasco deal for Bluestone LV coal

To Jim: Bluestone MV for Burns...


To Jim: Bluestone mv export


To Jim: confirmation of Dofa

Dear Jim,

Appreciate your confirmation. Assuming that your confirmation is extended to all terms mentioned in my emails, we will work out the draft contracts and will pass them to you within best delays.

Thank you

Liem Hazoumé | Lead Buyer

Corporate Raw Materials_SolidFuels (Coal & Coke) department ArcelorMittal Purchasing

Purchasing | 1 à 5, rue Luigi Cherubini
F-93200 Saint-Denis - France
T +33 1 71 92 08 40 | M +33 6 14 61 23 51 | www.arcelormittal.com

Personal email : liem.hazoume@arcelormittal.com
Team email: solidfuels@arcelormittal.com

-----Message d'origine-----
De : Jim Justice [mailto:jim@bluestoneindustries.com]
Envoyé : mardi 4 décembre 2007 22:49
À : HAZOUME Liem
Objet :

Liem,

Pursuant to your request, we are pleased to confirm all of our upcoming business as outlined in your December 1, 2007 e-mail.

Arcelor Mittal - Export
20,000 metric tons Bluestone MV Coal December 2007 @ $91.75 per net ton
360,000 net tons Bluestone MV Coal April 2008 - March 2009 @ $90 per net ton
360,000 net tons Bluestone MV Coal April 2009 - March 2010 with price TBN

Arcelor Mittal - Dofasco
120,000 net tons per year Bluestone LV Coal 2008 - 2010 @ $81.72 per net ton for 2008 with a +/- $5 price collar for 2009 and 2010. There is a mutual

option for up to 110,000 additional tons in 2009 and 2010 with the option to be declared by August of the preceding year.

Arcelor Mittal - ISG/Burns Harbor
400,000 net tons per year Bluestone MV Coal @ $98 per net ton in 2008 with a +/- $5 price collar for 2009 to be calculated from a base price of $95 per net ton

Arcelor Mittal - Sun Coke Energy (Confirms Jeff Wozek's November 30, 2007 e-mail)
60,000 net tons Bluestone LV Coal November 2007 - February 2008 @ $88.90 per net ton
120,000 net tons per year Bluestone LV Coal 2008 - 2009 @ $88.90 per net ton with a +/- $5 price collar for 2009
300,000 net tons per year Bluestone MV Coal 2008 - 2009 @ $87.55 per net ton in 2008 with a +/- $5 price collar for 2009

We hope this confirmation is sufficient to your needs.

We are very grateful for your business, and I appreciate your friendship.

Thanks again,

Jim

# EXHIBIT B

**Official Copy**

**PURCHASE ORDER NO.**

**B077036**

**REV. 004 REV DATE: 1/15/2008**

**ArcelorMittal Steel USA**




**Issue Date:** 1/15/2008

Please reference P.O.No. on all documents. Ship to address shown and invoice to Accounts Payable at address shown unless otherwise noted.

| | |
|---|---|
| Bluestone Coal Sales Corporation*<br>PO Box 1085<br>Beckley, WV 25802<br><br>**Contact:** Janet Ransom **Vendor No:** 075907<br>**Phone:** 304-252-8528 **Fax:** 304-929-2339 | **SHIP TO:**<br>ArcelorMittal Burns Harbor LLC<br>250 West US Highway 12<br>Burns Harbor, IN 46304 |
| **SEND INVOICES TO:**<br>ArcelorMittal Burns Harbor LLC<br>250 West US Highway 12<br>Accounts Payable Department<br>Burns Harbor, IN 46304 | **SHIP VIA** ;Best Way<br>**FREIGHT TERMS** ;Prepaid<br>**CASH TERMS** ;Net 30 Days<br>**FOB** ;Destination |

CHANGE ORDER ISSUED TO CORRECT PRICING/hdl 1/15/08

CHANGE ORDER ISSUED TO INCLUDE BALANCE OF 2008/hdl 1/11/08

This order covers the 1st quarter of 2008, remaining quarters will be added to this order.

Commercial contact: Herb Lewis 219-787-3604, fax 219-787-3313.

AP-Addr-BH

Receiving Location for materials (non bulk, non-service) - Central Spares, 219-787-3470

DIRECTIONS:
Please contact 219-787-4018 for automated, 24 hour directions to our plant, if required.

MSDS CLAUSE
The seller is required to ensure prior to delivery that Mittal Steel USA Burns Harbor possesses either a current Material Safety Data Sheet (MSDS) or a certification that a MSDS is not mandatory for any product that is brought onto plant-site. This information can be supplied via hard copy to:
Burns Harbor Plant
ATTN: Environmental Department
250 West U.S. Highway 12
Burns Harbor, IN 46304-9745
or electronically to theresa.kirk@mittalsteel.com. Failure to comply with this requirement entitles the buyer to demand immediate removal of the product from plant-site at the seller's expense and full reimbursement for the purchase price of the product.

FOB: DELIVERED
Mittal Steel USA - Burns Harbor does not pay freight as a separate bill or line item: so please make sure that all quotes submitted for consideration are FOB: delivered only. Ideally, product price and freight cost should be noted and equal the total price for the line item quoted.

PO DOCUMENTS
All bills of lading/packing slips, invoices and other correspondence related to this purchase order must reflect this purchase order number. Failure to comply with this requirement will result in payment delays

PLEASE FORWARD ALL INVOICES ASSOCIATED WITH Mittal Steel USA-BURNS HARBOR TO THE FOLLOWING:

Mittal Steel USA - BURNS HARBOR
ATTN: ACCOUNTS PAYABLE
250 WEST US HIGHWAY 12
BURNS HARBOR, INDIANA 46304-9745

A/P CONTACT: D. Richardson, 219-787-2195 or M. Clayton, 219-787-3375, R. Terpstra-Lewis 219-787-4432 or D. Shepard, 219-787-2140
A/P FAX: 4435

**Official Copy**

**PURCHASE ORDER NO.**

**B077036**

**REV. 004 REV DATE: 1/15/2008**

**ArcelorMittal Steel USA**




SURCHARGES

Mittal Steel USA Burns Harbor does not typically pay any fuel or other surcharges. Rare exceptions must be requested in writing to the specific buyer and have been reviewed / approved in writing by Purchasing. Billing for such unapproved surcharges will result in short-paid invoices.

AP-Addr-BP

ISG - Burns Harbor does not pay freight; so please make sure that all quotes submitted for consideration are FOB: delivered only

All bills of lading/packing slips, invoices and other correspondence related to this purchase order must reflect this purchase order number. Failure to comply with this requirement will result in payment delays

Suppliers may request a copy of the ISG Standard Terms & Conditions or tax exempt certificates by contacting the buyer identified on this order.

DIRECTIONS TO PLANT:
Please contact 219-787-4018 for automated, 24 hour directions to our plant, if required.

| Line | Quantity | Part number / Description | Unit Price | Extension ($) |
|---|---|---|---|---|
| 1 | 100000 NT | R34001021<br>Red Fox Low Vol<br>BLUESTONE COAL SALES TO PROVIDE, AS DIRECTED AND SCHEDULED DURING 1ST QUARTER 2008, APPROX 100,000 NT OF RED FOX LOW VOL COKING COAL @ $97.50/NT FOB MINE. QUARTERLY TONNAGE NUMBERS ARE ONLY ESTIMATES AND WILL BE ORDERED ON AS NEEDED BASIS. EACH QUARTER (LINE ITEM) WILL BE CLOSED BASED ON ACTUAL SHIPPED TONS. ALL INVOICES AND CORRESPONDENCE MUST REFERENCE THIS PURCHASE ORDER NUMBER TO BE PROCESSED FOR PAYMENT. INVOICES CAN BE US MAILED, FAXED @ (219) 787-3899 OR EMAILED TO CHUCK CREASBAUM @ CHARLES.CREASBAUM@ARCELORMITTALSTEEL.COM. PLANT CONTACTS ARE LARRY MAYTON @ (219) 787-2422 AND CHUCK CREASBAUM @ (219) 787-7985.<br>Requisitioned by: Creasbaum, Chuck<br>Phone: 219-787-7985 Taxable: N<br>Req No: RQB0205552<br>RFQ:<br>Deliver To: C CREASBAUM Date Promised: 3/31/2008<br>Deliver Area: Coke Plant Door 1001 | 98.00 | 9,800,000.00 |

**Official Copy**

**PURCHASE ORDER NO.**

**B077036**

**REV. 004 REV DATE: 1/16/2008**

**ArcelorMittal Steel USA**




| Line | Quantity | Part number / Description | Unit Price | Extension ($) |
|---|---|---|---|---|
| 2 | 100000 NT | R34001021<br>Red Fox Low Vol<br>BLUESTONE COAL SALES TO PROVIDE, AS DIRECTED AND SCHEDULED DURING 2ND QUARTER 2008, APPROX 100,000 NT OF RED FOX LOW VOL COKING COAL @ $87.50/NT FOB MINE. QUARTERLY TONNAGE NUMBERS ARE ONLY ESTIMATES AND WILL BE ORDERED ON AS NEEDED BASIS. EACH QUARTER (LINE ITEM) WILL BE CLOSED BASED ON ACTUAL SHIPPED TONS. ALL INVOICES AND CORRESPONDENCE MUST REFERENCE THIS PURCHASE ORDER NUMBER TO BE PROCESSED FOR PAYMENT. INVOICES CAN BE US MAILED, FAXED @ (219) 787-3899 OR EMAILED TO CHUCK CREASBAUM @ CHARLES.CREASBAUM@ARCELORMITTALSTEEL.COM. PLANT CONTACTS ARE LARRY MAYTON @ (219) 787-2422 AND CHUCK CREASBAUM @ (219) 787-7965.<br>Requisitioned by: Creasbaum, Chuck<br>Phone: 219-787-7965 Taxable: N<br>Req No: RQB0205552<br>RFQ:<br>Deliver To: C CREASBAUM Date Promised: 6/30/2008<br>Deliver Area: Coke Plant Door 1001 | 98.00 | 9,800,000.00 |
| 3 | 100000 NT | R34001021<br>Red Fox Low Vol<br>BLUESTONE COAL SALES TO PROVIDE, AS DIRECTED AND SCHEDULED DURING 3RD QUARTER 2008, APPROX 100,000 NT OF RED FOX LOW VOL COKING COAL @ $87.50/NT FOB MINE. QUARTERLY TONNAGE NUMBERS ARE ONLY ESTIMATES AND WILL BE ORDERED ON AS NEEDED BASIS. EACH QUARTER (LINE ITEM) WILL BE CLOSED BASED ON ACTUAL SHIPPED TONS. ALL INVOICES AND CORRESPONDENCE MUST REFERENCE THIS PURCHASE ORDER NUMBER TO BE PROCESSED FOR PAYMENT. INVOICES CAN BE US MAILED, FAXED @ (219) 787-3899 OR EMAILED TO CHUCK CREASBAUM @ CHARLES.CREASBAUM@ARCELORMITTALSTEEL.COM. PLANT CONTACTS ARE LARRY MAYTON @ (219) 787-2422 AND CHUCK CREASBAUM @ (219) 787-7965.<br>Requisitioned by: Creasbaum, Chuck<br>Phone: 219-787-7965 Taxable: N<br>Req No: RQB0205552<br>RFQ:<br>Deliver To: C CREASBAUM Date Promised: 9/30/2008<br>Deliver Area: Coke Plant Door 1001 | 98.00 | 9,800,000.00 |

**Official Copy**

**PURCHASE ORDER NO.**
**B077038**
**REV. 004 REV DATE: 1/15/2008**
**ArcelorMittal Steel USA**




| Line | Quantity | Part number / Description | Unit Price | Extension ($) |
|---|---|---|---|---|
| 4 | 100000 NT | R34001021<br>Red Fox Low Vol<br>BLUESTONE COAL SALES TO PROVIDE, AS DIRECTED AND SCHEDULED DURING 4TH QUARTER 2008, APPROX 100,000 NT OF RED FOX LOW VOL COKING COAL @ $87.50/NT FOB MINE. QUARTERLY TONNAGE NUMBERS ARE ONLY ESTIMATES AND WILL BE ORDERED ON AS NEEDED BASIS. EACH QUARTER (LINE ITEM) WILL BE CLOSED BASED ON ACTUAL SHIPPED TONS. ALL INVOICES AND CORRESPONDENCE MUST REFERENCE THIS PURCHASE ORDER NUMBER TO BE PROCESSED FOR PAYMENT. INVOICES CAN BE US MAILED, FAXED @ (219) 787-3899 OR EMAILED TO CHUCK CREASBAUM @ CHARLES.CREASBAUM@ARCELORMITTALSTEEL.COM. PLANT CONTACTS ARE LARRY MAYTON @ (219) 787-2422 AND CHUCK CREASBAUM @ (219) 787-7965. | 98.00 | 9,800,000.00 |

**Requisitioned by:** Creasbaum, Chuck
**Phone:** 219-787-7965 **Taxable:** N
**Req No:** RQB0205652
**RFQ:**
**Deliver To:** C CREASBAUM **Date Promised:** 12/31/2008
**Deliver Area:** Coke Plant Door 1001

**Total:** 39,200,000.00

**ArcelorMittal USA values / Aims for integrity, fairness and ethical behavior in all its business relations. In order to facilitate reporting illegal or unethical behaviors please use the following web link.**

http://www.mittalsteel.com/Company/Management/Reporting+Illegal+or+Unethical+Behaviour.htm

Or Compliance No. is 1-888-242-7305.

**ArcelorMittal USA and Subsidiary Companies General Purchasing Conditions for Purchase of Goods or Services or Both Goods and Services, AMUSA-100 for Purchase Orders, available this date at web site**

www.mittalsteel.com/Facilities/Americas/Mittal+Steel+USA/Procurement/terms+and+conditions.htm

**"Purchase Order (AMUSA-100)" apply to this Order.**

## ARCELOR MITTAL GROUP

**Mittal Steel USA Inc. and Subsidiary Companies**
**General Purchasing Conditions for Purchase of Goods or Services or Both Goods and Services**
**MUSA-100 (February Rev. 3) for Purchase Orders**

### 1. SCOPE OF APPLICATION

1.1 These General Purchasing Conditions ("GPC") shall apply to the purchase of any materials, items, products, components, software and any related services ("Goods") offered or provided by suppliers ("Seller"). They apply to all requests made by the Buyer for quotations or offers, to any offers made by Seller and are an integral part of any order ("Order") placed by the Buyer with Seller. For the purpose of these GPC, Buyer means the issuer of this Order that is (i) a company directly or indirectly controlled by MITTAL STEEL COMPANY N.V., including its successors in title, assigns and/or transferees as the case may be and/or (ii) a subsidiary acting on behalf of companies as defined in (i) above. No terms and conditions other than these GPC, the provisions of the Order and any and all documents incorporated therein by reference shall be binding upon the Buyer unless expressly accepted in writing. No terms and conditions contained in order confirmations, prior offers or any other document issued by Seller shall be binding on the Buyer, even if they have not been expressly rejected. The failure of either Party hereto, at any time, to enforce any terms and conditions of this Order shall not be construed to be a waiver of the right of such party thereafter to enforce any terms and conditions.

1.2. No order, amendment thereof, addition or a complement thereto shall be binding on the Buyer unless expressly accepted in writing in the form of an Order or change Order issued by the Buyer.

1.3 If individual terms of these GPC cannot be applied for any reason whatsoever, all other terms and conditions will remain unaffected.

1.4 Special provisions of an Order, specific terms agreed in writing with Seller, and any and all documents incorporated therein which may be in contradiction with these GPC, shall prevail over the corresponding GPC provisions.

### 2. PRICES - QUOTATION - CONDITIONS OF PAYMENT - INVOICING - TIME AND MATERIAL WORK

2.1 All Order prices shall be fixed firm and not subject to revision. They are inclusive of all taxes (VAT excepted), contributions, insurances and all other costs incurred by Seller in performing the Order up to and including Goods' delivery at the precise final location indicated by the Buyer, of all packing, protecting, lashing and anchoring materials and of all necessary documents, accessories, devices and/or appropriate tools in view of a complete and functional use and maintenance, and include all payments for the use of any intellectual property rights including those of third parties.

2.2 After each delivery of Goods pursuant to an Order, Seller shall send duplicate invoices established in accordance with all applicable legal and Buyer requirements, and which shall show the Buyer's Order number and date, Seller's references, the relevant stage of contractual performance at which a down payment may be invoiced, and shall specify the amount of any down payment or balance requested. No invoice shall relate to more than one Order.

2.3 Unless otherwise specified on the face of this Order, duly issued invoices shall be paid within 90 days from receipt thereof by the Buyer, subject to all payments being made on the 10th and 25th of each month. However, Buyer shall be entitled to withhold payment if Seller fails to meet the requirements of the Order. In this case Seller shall have no claim for interest (even on a portion of the price), penalties or any other compensation.

2.4 The absence of an express rejection of an invoice shall not constitute acceptance thereof. Payment of an invoice shall not constitute acceptance of any Goods ordered or delivered. Acceptance of Goods by the Buyer, to be valid, must be express and explicit and will represent only Buyer's acknowledgment that delivery has been made.

2.5 Buyer may credit toward the payment of any monies otherwise due Seller hereunder any monies that Seller may now or hereafter owe to Buyer or to any of its affiliates.

2.6 Where the purchase price hereunder is to be determined by Seller's time or cost of materials, or otherwise from records to be maintained by Seller, Seller will retain all records necessary for such determination for a period of at least three (3) years after the completion of this Order and will permit Buyer or its representatives access thereto at all reasonable times for the purposes of audit. To the extent the portion of the purchase price determined by Seller's time exceeds $100,000 in any calendar year, Seller will provide

## ARCELOR MITTAL GROUP

Buyer with a reconciliation of actual tax and insurance costs included in the invoiced rate and any difference shall be reflected as an adjustment to the purchase price. All time and material work shall be priced in accordance with the instructions therefor set forth at http://www.mittalsteel.com/Facilities/Americas/Mittal+Steel+USA/Procurement/Terms+and+Conditions.htm

### 3. QUALITY - SAFETY - SUSTAINABLE DEVELOPMENT - COMPLIANCE WITH APPLICABLE LAW

3.1 Before making any offer or quotation, Seller will (i) obtain all information relating to Buyer's needs and foreseeable use of the Goods, in order to provide Buyer with all necessary advice and information on Goods proposed, (ii) inform themselves fully with regard to standards, customs, rules and legal standards applicable to each delivery. For the proper performance of Orders, Seller shall (i) define and apply quality assurance programs, and (ii) conduct all necessary quality investigations and testing. Seller shall keep Buyer fully informed of the results of such measures.

3.2 Through the application of the principles of sustainable development, the Buyer is strongly committed to the protection and improvement of safety, health, social dialogue and the environment. Safety in the workplace, in particular, is a priority for Buyer. Seller shall provide Buyer with Goods and/or any necessary equipment, which fully satisfy the safety, health, social dialogue and environmental rules applicable to each delivery (such as laws and regulations, Buyer's safety rules, etc.).

3.3 Seller shall inform Buyer of any pertinent information in the areas of security, safety or the environment that relates to the Goods and/or their processing, handling or use. To this end, Seller will seek information from Buyers with regard to all special features (configuration, activities, transportation, traffic and circulation...) of the specified place of delivery. Such information provided to Seller shall in no way limit Seller's liability. Should Seller commit a violation relating to safety, health or environmental obligations, Buyer will be entitled to cancel any Order, with Seller bearing all expense and liability arising therefrom.

3.4 Seller shall therefore accept any liability with respect to any adverse effect arising from its action or inaction with respect to quality, safety, security and the environment and do so both with respect to Buyer or any third party, the Seller acknowledging its full liability in event of the exercise of Buyer's right to cancel the concerned Order.

3.5 In connection <u>only</u> with any services provided on Buyer's premises, the following shall apply: Seller shall strictly comply with the Contractor Safety, Health and Environmental Handbook (the "Safety Handbook"), accessible at http://www.mittalsteel.com/Facilities/Americas/Mittal+Steel+USA/Procurement/Terms+and+Conditions.htm and any other applicable safety codes or procedures in place at and provided in writing to Seller for Buyer's premises where the services are performed.

3.6(a) Any clause required under any applicable law to be included in this Order shall be deemed to be incorporated by reference into this Order. Seller shall comply with all federal, state and local laws and ordinances and all lawful regulations of any public authority. Without limiting the generality of the foregoing, Seller warrants that all materials or services furnished under this Order shall comply with all federal, state and local laws, rules and regulations pertaining to safety and health, including but not limited to the Federal Occupational Safety and Health Act of 1970, as amended, and safety standards promulgated pursuant thereto, and that Seller will comply with all applicable laws, regulations, ordinances, executive orders and rules with regard to discrimination as to age, race, color, religious creed, sex, ancestry or national origin, physical or mental disability and veteran status. Seller represents and warrants, as of the date of delivery, that all goods were produced in compliance with the Fair Labor Standards Act, as amended, and all regulations and orders of the United States Department of Labor issued thereunder.

(b) Without in any way limiting the requirements of Article 3.6(a) above, the following shall apply to this Order:

(i) The provisions of the Equal Opportunity Clauses at 41 CFR Section 60-1.4(a) and 41 CFR Section 60-250.5(a) and Section 60-741.5(a) are hereby incorporated as terms and conditions of this Order.

(ii) Seller's invoices for goods shall state thereon, "We hereby certify that these goods were produced in compliance with all applicable requirements of Section 5, 7 and 12 of the Fair Labor Standards Act, as amended, and of regulations and orders of the United States Department of Labor issued under Section 14 thereof."

(iii) The OSHA Hazard Communication Standard (29 CFR Section 1910.1200 requires that each hazardous chemical in the workplace be properly labeled and accompanied by an appropriate Material Safety Data Sheet

## ARCELOR MITTAL GROUP

("MSDS"), so, in accordance with the law, Buyer will not pay any invoice for a hazardous chemical unless it is properly labeled upon receipt and Buyer has received an appropriate MSDS.

(iv) As applicable, all nonexempt contractors and vendors will comply with the provisions of 29 CFR Part 470 (Obligations of Federal Contractors and Subcontractors; Notice of Employee Rights Concerning Payment of Union Dues or Fees).

### 4. DELIVERY - TRANSFER OF TITLE - PACKAGING - TRANSPORTATION

4.1 Unless otherwise agreed, all Goods shall be sold FOB Buyer's plant (per U.S. definitions under the Uniform Commercial Code Sec. 2-319) (equivalent to the DDP Incoterms (in accordance with the ICC's most recent edition)), unloaded at the final location indicated by the Buyer (the "Delivery"). If no more specific place of delivery is specified, delivery can be made only at the discharging bay or such other place where Buyer usually takes delivery.

4.2 Before Delivery:
- Seller shall inspect Goods for compliance with Order specifications, quality, weight, and physical dimensions, as well as for any damage to the Goods or their packaging.
- Goods shall be packed so that they will not be damaged during transportation or handling. All items shall be properly marked according to (i) applicable rules, especially in the case of dangerous goods, if any, (ii) Buyer's instructions, and at a minimum marking shall set out Buyer's Order number, Seller's identification, item number, place of delivery, item description, weight and quantity, and all markings required for proper delivery and assembly. Sling and handling points shall be provided with the Goods. If Buyer so requests, Seller shall take back all packaging material after delivery. If Seller requires the use of Buyer's lifting equipment or employees at the place of delivery, Buyer will require at least 24 hours notice and their use shall be at Seller's risk.
- Packaging materials and methods will be selected by Seller to minimize cost of usage and to meet the following objectives: protection, safekeeping, recyclability, energy saving and destruction.

4.3 Transportation:
- Seller undertakes to take all measures necessary to perform proper transportation of the Goods by all appropriate means and using all appropriate equipment and accessories, with the assistance of competent and solvent agents or subcontractors where necessary. Seller shall organize transportation of the Goods to the place of delivery in a manner designed to avoid damage to the Goods, and so as to avoid difficulties in unloading the Goods at the Buyer's place of delivery.
- Delivery times set out in the Order shall be of the essence. If the Order is not performed in the specified time, the Buyer is entitled to cancel the Order and to claim damages from the Seller or to accept delivery and withhold liquidated damages from the Seller (as set out below), without any requirement that Buyer give prior notification of default. Buyer reserves the right to refuse partial or early deliveries, and in such cases may return the Goods or, at its choice, store them, at Seller's costs and risks.
- Seller shall immediately notify the Buyer in writing of any delays and simultaneously provide all information concerning the reason and/or extent of the delay, as well as details relating to the efforts Seller intends to make in order to avoid delay or expedite delivery. In the event of a delay in delivery, the Buyer shall be entitled, without prejudice to any other remedies, to liquidated damages in the amount of 1 % of the order value for each full week of delay, not to exceed a maximum of 10 %. Buyer shall communicate its decision to withhold liquidated damages no later than the date of payment of the first invoice following the delay. Such liquidated damages shall be without prejudice to Buyer's rights to claim for damages related to other aspects of Seller's performance.

4.4 Title to the Goods shall transfer unconditionally to the Buyer upon delivery thereof. Risks will, however, remain with Seller until formal acceptance of the Goods.

### 5. ACCEPTANCE - INSPECTION

5.1 Without prejudice to the terms of Article 4.2, Buyer reserves the right to verify the progress and proper performance of the Order and to conduct any quality investigations and testing it deems advisable. Seller shall provide Buyer and its representatives free access to Seller's workshops at all times. This shall in no way relieve Seller from its duties under the Order, or limit them in any way.

5.2 All requirements mentioned in Buyer's quality systems are to be considered as conditions of the Order itself. Seller shall have an established and implemented Quality System in accordance with ISO 9001 (2000) and TS 16949 (2002) or their equivalent (depending on the nature of the Goods). The Buyer or its representative shall have the right to undertake quality audits and verifications of Seller's or of any subcontractor's quality system.

ARCELOR MITTAL GROUP

5.3 In the event of refusal of all or part of any delivery, Goods rejected shall be stored and shipped back by the Buyer at Seller's expenses and risk.

**6. TECHNICAL DOCUMENTATION - OPERATING AND MAINTENANCE MANUALS**

Seller shall deliver to the Buyer, at such times as may be agreed but at the latest upon delivery of the Goods, all technical documentation relating to the Goods, such as operating and maintenance manuals, training manuals, drawings, technical data sheets, product safety sheets, mill inspection certificates, certificates of conformity and any other supporting documentation. If not otherwise specified in the Order, the delivery of software or of goods including software will include, for maintenance and/or adaptability reasons, all source and object codes relating to it. Such technical documentation, or any special tools in relation to Orders remain the property of Buyer and shall be considered as integral part of Goods in the meaning of these GPC. Notwithstanding anything in this Order or otherwise to the contrary, but subject to Seller's applicable patent rights, if any, Buyer may use and make copies of any Seller's Documents delivered to it under this Order as necessary or reasonably convenient for the purpose of operating, maintaining, repairing, servicing, rebuilding, or modifying any goods delivered to Buyer under this Order or contracting with others to perform any of those services.

**7. WARRANTY - LIABILITY**

7.1 Seller warrants that the Goods shall be in accordance with all agreed specifications and requirements, shall be state of the art and fit for the particular purposes intended by the Buyer, shall be free from defects in design, materials and workmanship, shall satisfactorily fulfill the performance requirements expected by the Buyer, shall meet all applicable statutory requirements and standards, especially those relating to the environment, safety and employment or labor laws and regulations, and shall unless otherwise expressly and clearly specified on the face of the Order be completely new throughout and shall not contain any rebuilt, reconditioned, repaired and/or used parts, components or materials (and in the event it is expressly and clearly stated on the face of the Order that any Goods and/or parts, components or materials may be rebuilt, reconditioned, repaired or used, then any such Goods delivered to the Buyer shall be clearly, accurately and prominently labeled accordingly). Any representations or warranties included in Seller's catalogues, brochures, sales literature and quality systems shall be binding on Seller. Seller warrants the adequacy of the technical specifications of the Order to meet the specific needs of the Buyer, and Seller acknowledges having examined those specifications thoroughly.

7.2 Seller warrants due performance of the Goods for a period of 2 years after they are put into service. Claims made under this warranty shall suspend the warranty period until Seller has remedied the default, and the warranty period will be extended accordingly.

7.3 If any Goods at any time are found not to be as warranted, Buyer shall have the option, by written notice to Seller, at Buyer's sole discretion: (a) to rescind the Order according to the provisions of Article 11 (Termination); (b) to accept such Goods with an equitable reduction in price; or (c) to reject such non-conforming Goods and require delivery of replacement Goods or the making of necessary repairs, at Seller's expense. All Goods rejected for any reason will be returned to Seller, at Seller's risks and expense, or will be stored at Seller's risk in Buyer's warehouses. After 15 days following notification of rejection, Seller shall be liable to pay warehouse storage charges for the Goods.

7.4 If Seller fails to deliver suitable replacements or make repairs promptly or urgently as the case may be, Buyer shall be entitled to replace or repair such Goods through an alternative supplier and recover all related costs from Seller.

7.5 Any Goods repaired or replaced shall be subject to the provisions of this Article, and the warranty period hereunder shall start a new following delivery or repair.

7.6 IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER UNDER THIS ORDER FOR CONSEQUENTIAL, INDIRECT OR SPECIAL DAMAGES, INCLUDING WITHOUT LIMITATION LOST PROFITS, REVENUES, PRODUCTION OR BUSINESS (COLLECTIVELY "CONSEQUENTIAL DAMAGES"); PROVIDED, HOWEVER, THAT FOR PURPOSES OF THE FOREGOING LIMITATION, CONSEQUENTIAL DAMAGES SHALL NOT INCLUDE ANY OBLIGATIONS TO DEFEND, INDEMNIFY OR HOLD HARMLESS OR OTHER LIABILITIES TO WHICH EITHER PARTY HAS EXPRESSLY AGREED UNDER THIS ORDER, WHETHER OR NOT THE UNDERLYING CAUSE FOR EITHER PARTY HAVING TO PERFORM ITS OBLIGATIONS TO DEFEND, INDEMNIFY OR HOLD HARMLESS OR BE LIABLE TO THE OTHER PARTY WOULD OTHERWISE UNDER LAW BE DEEMED TO BE CONSEQUENTIAL DAMAGES.

## ARCELOR MITTAL GROUP

7.7 Buyer's rights and remedies as set out in these GPC shall be in addition to any other rights and remedies provided by law.

7.8 In any case, no inspection, approval or acceptance of Goods shall relieve Seller from responsibility for defects or other failures to meet the requirements of the Order.

7.9 Seller warrants to supply the Goods, and parts or components thereof for repair, maintenance or extensions, through the whole period of the Order, including the warranty period, and further warrants that their production or distribution will not be halted. If Seller decides to stop production of all or part of the Goods after the end date of the Order, Seller shall inform Buyer of this fact at least one year in advance, so that the Buyer still has an opportunity to place additional orders.

### 8. INTELLECTUAL PROPERTY RIGHTS

8.1 Seller warrants that neither the Goods nor the sale thereof covered by the Order will infringe upon or violate any trademarks, patents, copyright or other legal rights of third parties. Seller shall indemnify and hold Buyer harmless against all actions or claims, liability, loss, costs, attorneys' fees, expenses and damages due to or arising from any infringement of intellectual property rights. Seller shall, at its own expense if so requested by the Buyer, defend the Buyer against all such claims, proceedings and suits.

8.2 In the event the Goods become the subject of actions or claims of infringement of intellectual property rights, Seller shall either in the shortest possible period obtain the right for the Buyer to use the Goods or modify or replace the Goods so that the infringement ends. Modification or replacement of the Goods shall never result in a decrease or reduction of the functionality or fitness of the Goods for the particular purpose used by Buyer. If Seller fails to carry out its duties as set out herein, the Buyer, with eight business days advance notice, shall be entitled to take such actions as it deems necessary and to recover the total cost of the Goods from Seller.

8.3 Patentable inventions and protect-able creations as well as their results, insofar as they arise from the Order, shall belong to the Buyer unless Seller establishes that they arise from Seller's sole inventive capacity, and were developed independently of the Order.

### 9. NON-DISCLOSURE - PROPRIETARY RIGHTS - CONFIDENTIALITY

9.1 All written or verbal information supplied by the Buyer to Seller regarding the Buyer's know how, specifications, procedures, needs and all technical information, documents and data shall be treated as confidential and shall not be disclosed to third parties without the Buyer's prior written consent during at least 10 years following date of disclosure to Seller. Such information shall be exclusively used for the performance of the Order, or for the purpose of preparing offers or quotations.

9.2 The rights of ownership and copyrights in any designs, drawings, samples and other documents delivered to Seller belong to Buyer and such items shall not be duplicated or disclosed to third parties at any time without Buyer's prior written consent.

9.3 Seller shall not take any photographs, videotapes, motion picture or digital images or use any other visual recording devices on any real property of Buyer or its affiliates without, and in each instance where granted, only to the extent of, the prior written approval of Buyer, which may be withheld in Buyer's sole discretion.

9.4 Upon Buyer's request, Seller shall execute any additional agreements regarding proprietary information or trade secrets in connection with this Order as Buyer may reasonably request.

### 10. FORCE MAJEURE

10.1 The party affected by an event beyond its reasonable control and which could not reasonably have been foreseen or avoided, including (without implying limitation) terrorism, insurrection, epidemic, flood, earthquake or like natural disaster ("Force Majeure") shall immediately notify the other party in writing of said event and furnish the other party with all relevant information and proof relating thereto, and particularly to the period of time said event may delay the timely performance of this Order. Strikes affecting Seller, public transportation or events of any type (including those defined as events of Force Majeure hereunder) affecting Seller's subcontractors or suppliers shall not be considered as events of Force Majeure excusing non performance of this Order.

10.2 In the event of an event of Force Majeure affecting Seller, the Buyer shall be entitled at its discretion:

(a) to agree with Seller on an extension of time for delivery; or

## ARCELOR MITTAL GROUP

(b) to terminate the Order or any part thereof, at any time, without further obligation or liability, and request the reimbursement of any sums already paid.

10.3 The price for shipments previously delivered remains due only if they may be fully used by the Buyer notwithstanding the subsequent failure to deliver the rest of the Order. Any excess amount paid as an advance by the Buyer shall be refunded by Seller.

10.4 Equipment breakdowns, shortage of materials, or any other cause beyond the reasonable control of the Buyer preventing the use of the ordered Goods or reducing the needs of the Buyer with respect to the Goods shall entitle the Buyer at its option to suspend or postpone delivery of the ordered Goods or to terminate in whole or in part the Order without further obligation or liability.

### 11. TERMINATION

11.1 Buyer shall always be entitled, even though Seller is not in breach of any obligation, to suspend the Order for a period determined by Buyer, or to terminate the same in whole or in part, by giving three days' advance notice to Seller. In the event of such a termination, Seller may charge Buyer reasonable costs incurred up to the time of termination relating to the Order. In no event shall Seller be entitled to indemnification for incidental or consequential damages or loss of profits.

11.2 In the event Seller fails to comply with any term or condition of this Order, Buyer shall be entitled, by written notice to Seller and without prejudice to any other remedy, to terminate the Order in whole or in part without any further liability or obligation and to recover from Seller all moneys paid by the Buyer in respect thereof, any additional costs incurred in procuring replacement Goods from an alternative supplier, and indemnification for losses or damages due incurred by the Buyer as the result of any Seller's late performance. The same shall apply in case Seller fails to make progress in producing or assembling the Goods so as to endanger the timely performance of this Order in accordance with its terms. Without prejudice to Article 4, the termination shall be made by registered letter, return receipt requested, fifteen days after the date formal notice of default is given.

11.3 Buyer is entitled to terminate the Order with immediate effect without any further obligation or liability if Buyer has good reasons to believe that Seller will be unable to normally execute its full obligations.

### 12. INDEMNITY

12.1 "Buyer's Indemnitees" shall mean, collectively, Buyer, including any of its affiliated companies, and their respective directors, officers, employees, agents and insurers. "Claims" shall mean, collectively, any and all claims, actions, suits, fines, penalties, and demands (including but not limited to claims of strict liability, negligence, fault imposed by statutes, rules or regulations, breach of contract and breach of warranty) for any liabilities, damages, judgments, awards, costs and expenses of every character whatsoever (including reasonable attorney's fees).

12.2 In connection <u>only</u> with any goods or off-site services provided under this Order, the following shall apply: Seller expressly agrees to defend, release, indemnify and save harmless Buyer's Indemnitees from and against all Claims on account of any loss or damage to property or bodily injuries or disease to persons, including death, occurring in connection with Seller's performance of this Order, except to the extent such injury, damage or loss is due to the negligence of Buyer's Indemnitees or its agents or contractors (other than Seller), provided, however, that, notwithstanding anything to the contrary, the condition or operation of Buyer's Indemnitees' production and manufacturing facilities in the normal course of Buyer's Indemnitees' businesses shall be deemed not to be negligence.

12.3 In connection <u>only</u> with any services provided on Buyer's premises, the following shall apply: Seller expressly agrees to indemnify, defend and save harmless Buyer's Indemnitees from and against any and all Claims on account of any loss or damage to property or bodily injuries or disease to persons, including death, made by Seller or any of its subcontractors or any employee, agent or invitee of Seller or any of its subcontractors by reason of any act or omission, whether negligent or otherwise, including without limitation concurrent, joint, comparative, active or passive negligent acts or omissions, on the part of any of Buyer's Indemnitees or the condition of the job site or other property of any of Buyer's Indemnitees or otherwise; and, to the extent it may relate to Seller's foregoing indemnity of Buyer's Indemnitees for employee injuries, illness, death or damages, Seller specifically waives any Workers Compensation statutory immunity that Seller might otherwise attempt to claim against Buyer's Indemnitees. Seller shall further indemnify, defend and save harmless Buyer's Indemnitees from and against any and all Claims made by any person or persons by reason of

## ARCELOR MITTAL GROUP

any act or neglect on the part of Seller or any of its subcontractors or any employee, agent or invitee of Seller or any of its subcontractors.

12.4 Seller agrees to assume at its expense, on behalf of Buyer's Indemnitees and at Buyer's demand, the defense against any Claim and to pay any amount for which Buyer's Indemnitees may be held liable in connection therewith. If any Claims are brought against any of Buyer's Indemnitees by any person directly or indirectly employed by Seller, or any person for whose acts Seller may be liable, Seller's indemnification obligation to Buyer's Indemnitees shall be absolute and shall not be limited or affected in any way by any Claims or benefits paid or payable by or on behalf of Seller under any Workers' Compensation acts, disability benefit acts or other employee benefit acts. Seller expressly waives any provision of any workers' compensation laws under which Seller could preclude its joinder as an additional defendant(s) or avoid liability for damages, contribution or indemnity in any actions, at law or otherwise, where Seller's employee or employees, its heirs, assigns or anyone else entitled to receive damages by reason of injury or death, makes a Claim against Buyer's Indemnitees. Unless specified otherwise in the commercial terms on the face of this Order, all services provided hereunder shall be deemed maintenance work and not construction work. Buyer reserves the right to retain sufficient funds to cover any Claims that arise before this Order is fully paid.

### 13. INSURANCE

Upon Buyer's request, Seller shall furnish acceptable proof of insurance policies evidencing Workers Compensation and occupational disease coverage, commercial general liability coverage, including both products and contractual liability coverage; employer's liability coverage, motor vehicle liability coverage and any specialty coverage (e.g., aircraft, watercraft, professional services, environmental remediation, explosives) for Seller's goods and/or services, all in amounts reasonably satisfactory to Buyer, but not less than $1,000,000 per occurrence and with insurers reasonably satisfactory to Buyer. The required policies of insurance for commercial general liability, employers liability, and motor vehicle liability shall cover Buyer as an additional insured and shall not have deductibles or self-insured retentions which are greater than the lesser of (i) five percent (5%) of the coverage limit provided by the policy, or (ii) the deductibles or self-insured retentions in Seller's general program of business insurance, unless approved in writing by Buyer. All required policies of insurance shall contain a waiver of subrogation and waiver of liens in favor of Buyer. Seller's insurance coverages shall be primary to and noncontributory with any other insurance carried by Buyer. Seller's provision of required insurance shall not relieve or otherwise limit any of Seller's other obligations or potential liabilities under this Order.

### 14. SUBCONTRACTING

If Seller is authorized to sub-contract all or part of its obligations to third parties, such sub-contracting shall be at Seller's sole expense and under Seller's sole responsibility. Seller shall inform all sub-contractors of the provisions of these GPC as well as those of the Order, and shall provide them with all information regarding the Buyer's requirements, especially in respect of applicable safety rules, Buyer reserving the right to refuse any of Seller's sub-contractors that are not in compliance with these conditions.

### 15. ASSIGNMENT

Seller shall not assign this Order, any rights under the Order or any receivables due from Buyer without the prior written consent of the Buyer.

### 16. JURISDICTION - APPLICABLE LAW

16.1 When no services are to be performed on Buyer's premises under this Order, the laws of the State of Illinois shall govern the validity and interpretation of this Order; when any services are or are to be performed on Buyer's premises under this Order, the laws of the State where Buyer's premises are located shall govern the validity and interpretation of this Order, all of the foregoing without regard to such State's laws concerning conflicts of law. The UN Convention on Contracts for the International Sale of Goods of 1980 shall not be applicable.

16.2 When any services are or are to be performed on Buyer's premises under this Order, the exclusive venue(s) for any legal action brought under this Order shall be the courts of applicable jurisdiction in the State(s) where such services are or are to be provided.

### 17. CODE OF CONDUCT - FRAUD & CORRUPTION

Seller represents that it has read and understand Buyer's "Code of Business Conduct," which is accessible at http://www.mittalsteel.com/Investor+Relations/Corporate+Governance/Code+of+Business+Conduct.htm , and that it have not taken any action inconsistent with or contrary to Buyer's Code of Business Conduct in obtaining this Order. Seller covenants that it shall not take any action inconsistent with or contrary to Buyer's Code of

## ARCELOR MITTAL GROUP

Business Conduct in the performance of this Order. In the event that Seller learns of any violation or alleged violation of Buyer's Code of Business Conduct, Seller shall report the violation or alleged violation by calling the Compliance Hotline Number, which is 1-888-242-7305. Seller shall prevent any fraudulent activity by any of its representatives in connection with the receipt of monies from Buyer. Seller warrants and undertakes that it has not given, and will not give, any gift or commission, nor has agreed, and will not agree, to pay commission to any Buyer's employee, agent, servant or representative in connection with this Order or any other contract with Buyer. If Seller, or anyone acting on the Seller's behalf, is in breach of the foregoing provisions Buyer may (i) terminate the Order and recover from Seller the amount of any loss suffered by Buyer resulting from such termination or (ii) recover in full from Seller any loss sustained by Buyer in consequence of any breach of this Article 17, whether or not the Order has been terminated.

**18. NO LIENS**

All goods and services hereunder shall be delivered and furnished free of all liens, Claims and encumbrances by, through or under Seller ("Liens"). Seller shall pay promptly all Claims and demands for all labor performed and for machinery, fuel or any other material or equipment furnished in the performance of this Order and shall fully defend, indemnify and save harmless Buyer against any Claims or debts on account of which Liens might be obtained and against court costs and reasonable attorneys' fees incurred or sustained by Buyer in discharging any Liens. Buyer reserves the right to use sums otherwise payable to Seller in order to discharge any Liens. Seller shall comply with all applicable laws in the state in which Buyer is located in taking action to protect Buyer against the imposition of Liens. Seller releases and forever waives any and all rights it may have under statutory or common law to assert, file or record any Lien. All right, title and interest (including without limitation any security interest(s)) to and in any of Buyer's property that has been placed into Seller's possession or custody and of any property that Buyer has paid Seller for but has not yet received ("Buyer Property") shall at all times be and remain Buyer's alone, and Seller shall have no ownership or other interest therein. Seller hereby authorize Buyer to prepare and file such Uniform Commercial Code financing statements confirming Buyer's continued ownership of the Buyer Property as Buyer reasonably deems necessary or appropriate to protect its interests. At Buyer's request, Seller shall execute and deliver such instruments as are reasonably necessary in order to fully protect the right, title and interest of Buyer to and in all such Buyer Property. Buyer may, at its option, notify the holder of any lien or security interest in Seller's personal property of Buyer's continued ownership of the Buyer Property. Seller shall segregate all Buyer Property from any other inventory or material in its possession to the maximum extent possible.

# EXHIBIT C

Official Copy

PURCHASE ORDER NO.

**B077036**

REV. 005 REV DATE: 7/24/2008

**ArcelorMittal Steel USA**




Issue Date: 7/24/2008

Please reference P.O.No. on all documents. Ship to address shown and invoice to Accounts Payable at address shown unless otherwise noted.

| | |
|---|---|
| Bluestone Coal Sales Corporation*<br>PO Box 1085<br>Beckley, WV 25802<br><br>Contact: Janet Ransom Vendor No: 075907<br>Phone: 304-252-8528 Fax: 304-929-2339 | **SHIP TO:**<br>ArcelorMittal Burns Harbor LLC<br>250 West US Highway 12<br>Burns Harbor, IN 46304 |
| **SEND INVOICES TO:**<br>ArcelorMittal Burns Harbor LLC<br>250 West US Highway 12<br>Accounts Payable Department<br>Burns Harbor, IN 46304 | **SHIP VIA** : Best Way<br>**FREIGHT TERMS** : Prepaid<br>**CASH TERMS** : Net 30 Days<br>**FOB** : Destination |

CHANGE ORDER ISSUED TO INCREASE PRICING $7.50 PER AGREEMENT WITH LIEM HAZOUME/hdl 7/24/08

CHANGE ORDER ISSUED TO CORRECT PRICING/hdl 1/15/08

CHANGE ORDER ISSUED TO INCLUDE BALANCE OF 2008/hsl 1/11/08

This order covers the 1st quarter of 2008, remaining quarters will be added to this order.

Commercial contact: Herb Lewis 219-787-3604, fax 219-787-3313.

AP-Addr-BH

Receiving Location for materials (non bulk, non-service) - Central Spares, 219-787-3470

DIRECTIONS:
Please contact 219-787-4018 for automated, 24 hour directions to our plant, if required.

MSDS CLAUSE
The seller is required to ensure prior to delivery that Mittal Steel USA Burns Harbor possesses either a current Material Safety Data Sheet (MSDS) or a certification that a MSDS is not mandatory for any product that is brought onto plant-site. This information can be supplied via hard copy to:
Burns Harbor Plant
ATTN: Environmental Department
250 West U.S. Highway 12
Burns Harbor, IN 46304-9745
or electronically to theresa.kirk@mittalsteel.com. Failure to comply with this requirement entitles the buyer to demand immediate removal of the product from plant-site at the seller's expense and full reimbursement for the purchase price of the product.

FOB: DELIVERED
Mittal Steel USA - Burns Harbor does not pay freight as a separate bill or line item; so please make sure that all quotes submitted for consideration are FOB: delivered only. Ideally, product price and freight cost should be noted and equal the total price for the line item quoted.

PO DOCUMENTS
All bills of lading/packing slips, invoices and other correspondence related to this purchase order must reflect this purchase order number. Failure to comply with this requirement will result in payment delays

PLEASE FORWARD ALL INVOICES ASSOCIATED WITH Mittal Steel USA-BURNS HARBOR TO THE FOLLOWING:

Mittal Steel USA - BURNS HARBOR
ATTN: ACCOUNTS PAYABLE
250 WEST US HIGHWAY 12
BURNS HARBOR, INDIANA 46304-9745

A/P CONTACT: D. Richardson, 219-787-2195 or M. Clayton, 219-787-3376, R. Terpstra-Lewis 219-787-4432 or D. Shepard, 219-787-2140

Official Copy

PURCHASE ORDER NO.

B077036

REV. 005 REV DATE: 7/24/2008

ArcelorMittal Steel USA




A/P FAX: 4436
**********************************************

SURCHARGES
==================================

Mittal Steel USA Burns Harbor does not typically pay any fuel or other surcharges. Rare exceptions must be requested in writing to the specific buyer and have been reviewed / approved in writing by Purchasing. Billing for such unapproved surcharges will result in short-paid invoices.

AP-Addr-BP
**********************************************

ISG - Burns Harbor does not pay freight; so please make sure that all quotes submitted for consideration are FOB: delivered only
**********************************************

**********************************************

All bills of lading/packing slips, invoices and other correspondence related to this purchase order must reflect this purchase order number. Failure to comply with this requirement will result in payment delays
**********************************************

Suppliers may request a copy of the ISG Standard Terms & Conditions or tax exempt certificates by contacting the buyer identified on this order.
**********************************************

DIRECTIONS TO PLANT:
Please contact 219-787-4018 for automated, 24 hour directions to our plant, if required.

| Line | Quantity | Part number / Description | Unit Price | Extension ($) |
|---|---|---|---|---|
| 1 | 100000 NT | R34001021<br>Red Fox Low Vol<br>BLUESTONE COAL SALES TO PROVIDE, AS DIRECTED AND SCHEDULED DURING 1ST QUARTER 2008, APPROX 100,000 NT OF RED FOX LOW VOL COKING COAL @ $87.50/NT FOB MINE. QUARTERLY TONNAGE NUMBERS ARE ONLY ESTIMATES AND WILL BE ORDERED ON AS NEEDED BASIS. EACH QUARTER (LINE ITEM) WILL BE CLOSED BASED ON ACTUAL SHIPPED TONS. ALL INVOICES AND CORRESPONDENCE MUST REFERENCE THIS PURCHASE ORDER NUMBER TO BE PROCESSED FOR PAYMENT. INVOICES CAN BE US MAILED, FAXED @ (219) 787-3899 OR EMAILED TO CHUCK CREASBAUM @ CHARLES.CREASBAUM@ARCELORMITTALSTEEL.COM. PLANT CONTACTS ARE LARRY MAYTON @ (219) 787-2422 AND CHUCK CREASBAUM @ (219) 787-7965.<br>Requisitioned by: Creasbaum, Chuck<br>Phone: 219-787-7965 Taxable: N<br>Req No: RQB0205552<br>RFQ:<br>Deliver To: C CREASBAUM Date Promised: 3/31/2008<br>Deliver Area: Coke Plant Door 1001 | 98.00 | 9,800,000.00 |

Official Copy

PURCHASE ORDER NO.

B077036

REV. 005 REV DATE: 7/24/2008

ArcelorMittal Steel USA




| Line | Quantity | Part number / Description | Unit Price | Extension ($) |
|---|---|---|---|---|
| 2 | 100000 NT | R34001021<br>Red Fox Low Vol<br>BLUESTONE COAL SALES TO PROVIDE, AS DIRECTED AND SCHEDULED DURING 2ND QUARTER 2008, APPROX 100,000 NT OF RED FOX LOWI VOL COKING COAL @ $87.50/NT FOB MINE. QUARTERLY TONNAGE NUMBERS ARE ONLY ESTIMATES AND WILL BE ORDERED ON AS NEEDED BASIS. EACH QUARTER (LINE ITEM) WILL BE CLOSED BASED ON ACTUAL SHIPPED TONS. ALL INVOICES AND CORRESPONDENCE MUST REFERENCE THIS PURCHASE ORDER NUMBER TO BE PROCESSED FOR PAYMENT. INVOICES CAN BE US MAILED, FAXED @ (219) 787-3899 OR EMAILED TO CHUCK CREASBAUM @ CHARLES.CREASBAUM@ARCELORMITTALSTEEL.COM. PLANT CONTACTS ARE LARRY MAYTON @ (219) 787-2422 AND CHUCK CREASBAUM @ (219) 787-7965.<br>Requisitioned by: Creasbaum, Chuck<br>Phone: 219-787-7965 Taxable: N<br>Req No: RQB0205552<br>RFQ:<br>Deliver To: C CREASBAUM Date Promised: 6/30/2008<br>Deliver Area: Coke Plant Door 1001 | 98.00 | 9,800,000.00 |
| 3 | 100000 NT | R34001021<br>Red Fox Low Vol<br>BLUESTONE COAL SALES TO PROVIDE, AS DIRECTED AND SCHEDULED DURING 3RD QUARTER 2008, APPROX 100,000 NT OF RED FOX LOWI VOL COKING COAL @ $87.50/NT FOB MINE. QUARTERLY TONNAGE NUMBERS ARE ONLY ESTIMATES AND WILL BE ORDERED ON AS NEEDED BASIS. EACH QUARTER (LINE ITEM) WILL BE CLOSED BASED ON ACTUAL SHIPPED TONS. ALL INVOICES AND CORRESPONDENCE MUST REFERENCE THIS PURCHASE ORDER NUMBER TO BE PROCESSED FOR PAYMENT. INVOICES CAN BE US MAILED, FAXED @ (219) 787-3899 OR EMAILED TO CHUCK CREASBAUM @ CHARLES.CREASBAUM@ARCELORMITTALSTEEL.COM. PLANT CONTACTS ARE LARRY MAYTON @ (219) 787-2422 AND CHUCK CREASBAUM @ (219) 787-7965.<br>Requisitioned by: Creasbaum, Chuck<br>Phone: 219-787-7965 Taxable: N<br>Req No: RQB0205552<br>RFQ:<br>Deliver To: C CREASBAUM Date Promised: 9/30/2008<br>Deliver Area: Coke Plant Door 1001 | 105.75 | 10,575,000.00 |

Official Copy

PURCHASE ORDER NO.

B077036

REV. 005 REV DATE: 7/24/2008

ArcelorMittal Steel USA



| Line | Quantity | Part number / Description | Unit Price | Extension ($) |
|---|---|---|---|---|
| 4 | 100000 NT | R34001021<br>Red Fox Low Vol<br>BLUESTONE COAL SALES TO PROVIDE, AS DIRECTED AND SCHEDULED DURING 4TH QUARTER 2008, APPROX 100,000 NT OF RED FOX LOWI VOL COKING COAL @ $87.50/NT FOB MINE. QUARTERLY TONNAGE NUMBERS ARE ONLY ESTIMATES AND WILL BE ORDERED ON AS NEEDED BASIS. EACH QUARTER (LINE ITEM) WILL BE CLOSED BASED ON ACTUAL SHIPPED TONS. ALL INVOICES AND CORRESPONDENCE MUST REFERENCE THIS PURCHASE ORDER NUMBER TO BE PROCESSED FOR PAYMENT. INVOICES CAN BE US MAILED, FAXED @ (219) 787-3699 OR EMAILED TO CHUCK CREASBAUM @ CHARLES.CREASBAUM@ARCELORMITTALSTEEL.COM. PLANT CONTACTS ARE LARRY MAYTON @ (219) 787-2422 AND CHUCK CREASBAUM @ (219) 787-7965.<br>Requisitioned by: Creasbaum, Chuck<br>Phone: 219-787-7965 Taxable: N<br>Req No: RQB0205552<br>RFQ:<br>Deliver To: C CREASBAUM Date Promised: 12/31/2008<br>Deliver Area: Coke Plant Door 1001 | 105.75 | 10,575,000.00 |
| | | | Total: | 40,750,000.00 |

**ArcelorMittal USA values / Aims for integrity, fairness and ethical behavior in all its business relations. In order to facilitate reporting illegal or unethical behaviors please use the following web link.**

http://www.mittalsteel.com/Company/Management/Reporting+Illegal+or+Unethical+Behaviour.htm

Or Compliance No. is 1-888-242-7305.

**ArcelorMittal USA and Subsidiary Companies General Purchasing Conditions for Purchase of Goods or Services or Both Goods and Services, AMUSA-100 for Purchase Orders, available this date at web site**

www.mittalsteel.com/Facilities/Americas/Mittal+Steel+USA/Procurement/terms+and+conditions.htm

**"Purchase Order (AMUSA-100)" apply to this Order.**

## ARCELOR MITTAL GROUP

Mittal Steel USA Inc. and Subsidiary Companies
General Purchasing Conditions for Purchase of Goods or Services or Both Goods and Services
MUSA-100 (February Rev. 3) for Purchase Orders

### 1. SCOPE OF APPLICATION

1.1 These General Purchasing Conditions ("GPC") shall apply to the purchase of any materials, items, products, components, software and any related services ("Goods") offered or provided by suppliers ("Seller"). They apply to all requests made by the Buyer for quotations or offers, to any offers made by Seller and are an integral part of any order ("Order") placed by the Buyer with Seller. For the purpose of these GPC, Buyer means the issuer of this Order that is (i) a company directly or indirectly controlled by MITTAL STEEL COMPANY N.V., including its successors in title, assigns and/or transferees as the case may be and/or (ii) a subsidiary acting on behalf of companies as defined in (i) above. No terms and conditions other than these GPC, the provisions of the Order and any and all documents incorporated therein by reference shall be binding upon the Buyer unless expressly accepted in writing. No terms and conditions contained in order confirmations, prior offers or any other document issued by Seller shall be binding on the Buyer, even if they have not been expressly rejected. The failure of either Party hereto, at any time, to enforce any terms and conditions of this Order shall not be construed to be a waiver of the right of such party thereafter to enforce any terms and conditions.

1.2. No order, amendment thereof, addition or a complement thereto shall be binding on the Buyer unless expressly accepted in writing in the form of an Order or change Order issued by the Buyer.

1.3 If individual terms of these GPC cannot be applied for any reason whatsoever, all other terms and conditions will remain unaffected.

1.4 Special provisions of an Order, specific terms agreed in writing with Seller, and any and all documents incorporated therein which may be in contradiction with these GPC, shall prevail over the corresponding GPC provisions.

### 2. PRICES - QUOTATION - CONDITIONS OF PAYMENT - INVOICING - TIME AND MATERIAL WORK

2.1 All Order prices shall be fixed firm and not subject to revision. They are inclusive of all taxes (VAT excepted), contributions, insurances and all other costs incurred by Seller in performing the Order up to and including Goods' delivery at the precise final location indicated by the Buyer, of all packing, protecting, lashing and anchoring materials and of all necessary documents, accessories, devices and/or appropriate tools in view of a complete and functional use and maintenance, and include all payments for the use of any intellectual property rights including those of third parties.

2.2 After each delivery of Goods pursuant to an Order, Seller shall send duplicate invoices established in accordance with all applicable legal and Buyer requirements, and which shall show the Buyer's Order number and date, Seller's references, the relevant stage of contractual performance at which a down payment may be invoiced, and shall specify the amount of any down payment or balance requested. No invoice shall relate to more than one Order.

2.3 Unless otherwise specified on the face of this Order, duly issued invoices shall be paid within 90 days from receipt thereof by the Buyer, subject to all payments being made on the 10th and 25th of each month. However, Buyer shall be entitled to withhold payment if Seller fails to meet the requirements of the Order. In this case Seller shall have no claim for interest (even on a portion of the price), penalties or any other compensation.

2.4 The absence of an express rejection of an invoice shall not constitute acceptance thereof. Payment of an invoice shall not constitute acceptance of any Goods ordered or delivered. Acceptance of Goods by the Buyer, to be valid, must be express and explicit and will represent only Buyer's acknowledgment that delivery has been made.

2.5 Buyer may credit toward the payment of any monies otherwise due Seller hereunder any monies that Seller may now or hereafter owe to Buyer or to any of its affiliates.

2.6 Where the purchase price hereunder is to be determined by Seller's time or cost of materials, or otherwise from records to be maintained by Seller, Seller will retain all records necessary for such determination for a period of at least three (3) years after the completion of this Order and will permit Buyer or its representatives access thereto at all reasonable times for the purposes of audit. To the extent the portion of the purchase price determined by Seller's time exceeds $100,000 in any calendar year, Seller will provide

## ARCELOR MITTAL GROUP

Buyer with a reconciliation of actual tax and insurance costs included in the invoiced rate and any difference shall be reflected as an adjustment to the purchase price. All time and material work shall be priced in accordance with the instructions therefor set forth at
http://www.mittalsteel.com/Facilities/Americas/Mittal+Steel+USA/Procurement/Terms+and+Conditions.htm

### 3. QUALITY - SAFETY - SUSTAINABLE DEVELOPMENT - COMPLIANCE WITH APPLICABLE LAW

3.1 Before making any offer or quotation, Seller will (i) obtain all information relating to Buyer's needs and foreseeable use of the Goods, in order to provide Buyer with all necessary advice and information on Goods proposed, (ii) inform themselves fully with regard to standards, customs, rules and legal standards applicable to each delivery. For the proper performance of Orders, Seller shall (i) define and apply quality assurance programs, and (ii) conduct all necessary quality investigations and testing. Seller shall keep Buyer fully informed of the results of such measures.

3.2 Through the application of the principles of sustainable development, the Buyer is strongly committed to the protection and improvement of safety, health, social dialogue and the environment. Safety in the workplace, in particular, is a priority for Buyer. Seller shall provide Buyer with Goods and/or any necessary equipment, which fully satisfy the safety, health, social dialogue and environmental rules applicable to each delivery (such as laws and regulations, Buyer's safety rules, etc.).

3.3 Seller shall inform Buyer of any pertinent information in the areas of security, safety or the environment that relates to the Goods and/or their processing, handling or use. To this end, Seller will seek information from Buyers with regard to all special features (configuration, activities, transportation, traffic and circulation...) of the specified place of delivery. Such information provided to Seller shall in no way limit Seller's liability. Should Seller commit a violation relating to safety, health or environmental obligations, Buyer will be entitled to cancel any Order, with Seller bearing all expense and liability arising therefrom.

3.4 Seller shall therefore accept any liability with respect to any adverse effect arising from its action or inaction with respect to quality, safety, security and the environment and do so both with respect to Buyer or any third party, the Seller acknowledging its full liability in event of the exercise of Buyer's right to cancel the concerned Order.

3.5 In connection only with any services provided on Buyer's premises, the following shall apply: Seller shall strictly comply with the Contractor Safety, Health and Environmental Handbook (the "Safety Handbook"), accessible at
http://www.mittalsteel.com/Facilities/Americas/Mittal+Steel+USA/Procurement/Terms+and+Conditions.htm
and any other applicable safety codes or procedures in place at and provided in writing to Seller for Buyer's premises where the services are performed.

3.6(a) Any clause required under any applicable law to be included in this Order shall be deemed to be incorporated by reference into this Order. Seller shall comply with all federal, state and local laws and ordinances and all lawful regulations of any public authority. Without limiting the generality of the foregoing, Seller warrants that all materials or services furnished under this Order shall comply with all federal, state and local laws, rules and regulations pertaining to safety and health, including but not limited to the Federal Occupational Safety and Health Act of 1970, as amended, and safety standards promulgated pursuant thereto, and that Seller will comply with all applicable laws, regulations, ordinances, executive orders and rules with regard to discrimination as to age, race, color, religious creed, sex, ancestry or national origin, physical or mental disability and veteran status. Seller represents and warrants, as of the date of delivery, that all goods were produced in compliance with the Fair Labor Standards Act, as amended, and all regulations and orders of the United States Department of Labor issued thereunder.

(b) Without in any way limiting the requirements of Article 3.6(a) above, the following shall apply to this Order:

(i) The provisions of the Equal Opportunity Clauses at 41 CFR Section 60-1.4(e) and 41 CFR Section 60-250.5(a) and Section 60-741.5(a) are hereby incorporated as terms and conditions of this Order.

(ii) Seller's invoices for goods shall state thereon, "We hereby certify that these goods were produced in compliance with all applicable requirements of Section 5, 7 and 12 of the Fair Labor Standards Act, as amended, and of regulations and orders of the United States Department of Labor issued under Section 14 thereof."

(iii) The OSHA Hazard Communication Standard (29 CFR Section 1910.1200 requires that each hazardous chemical in the workplace be properly labeled and accompanied by an appropriate Material Safety Data Sheet

## ARCELOR MITTAL GROUP

("MSDS"), so, in accordance with the law, Buyer will not pay any invoice for a hazardous chemical unless it is properly labeled upon receipt and Buyer has received an appropriate MSDS.

(iv) As applicable, all nonexempt contractors and vendors will comply with the provisions of 29 CFR Part 470 (Obligations of Federal Contractors and Subcontractors; Notice of Employee Rights Concerning Payment of Union Dues or Fees).

### 4. DELIVERY - TRANSFER OF TITLE - PACKAGING - TRANSPORTATION

4.1 Unless otherwise agreed, all Goods shall be sold FOB Buyer's plant (per U.S. definitions under the Uniform Commercial Code Sec. 2-319) (equivalent to the DDP Incoterms (in accordance with the ICC's most recent edition)), unloaded at the final location indicated by the Buyer (the "Delivery"). If no more specific place of delivery is specified, delivery can be made only at the discharging bay or such other place where Buyer usually takes delivery.

4.2 Before Delivery:

- Seller shall inspect Goods for compliance with Order specifications, quality, weight, and physical dimensions, as well as for any damage to the Goods or their packaging.
- Goods shall be packed so that they will not be damaged during transportation or handling. All items shall be properly marked according to (i) applicable rules, especially in the case of dangerous goods, if any, (ii) Buyer's instructions, and at a minimum marking shall set out Buyer's Order number, Seller's identification, item number, place of delivery, item description, weight and quantity, and all markings required for proper delivery and assembly. Sling and handling points shall be provided with the Goods. If Buyer so requests, Seller shall take back all packaging material after delivery. If Seller requires the use of Buyer's lifting equipment or employees at the place of delivery, Buyer will require at least 24 hours notice and their use shall be at Seller's risk.
- Packaging materials and methods will be selected by Seller to minimize cost of usage and to meet the following objectives: protection, safekeeping, recyclability, energy saving and destruction.

4.3 Transportation:

- Seller undertakes to take all measures necessary to perform proper transportation of the Goods by all appropriate means and using all appropriate equipment and accessories, with the assistance of competent and solvent agents or subcontractors where necessary. Seller shall organize transportation of the Goods to the place of delivery in a manner designed to avoid damage to the Goods, and so as to avoid difficulties in unloading the Goods at the Buyer's place of delivery.
- Delivery times set out in the Order shall be of the essence. If the Order is not performed in the specified time, the Buyer is entitled to cancel the Order and to claim damages from the Seller or to accept delivery and withhold liquidated damages from the Seller (as set out below), without any requirement that Buyer give prior notification of default. Buyer reserves the right to refuse partial or early deliveries, and in such cases may return the Goods or, at its choice, store them, at Seller's costs and risks.
- Seller shall immediately notify the Buyer in writing of any delays and simultaneously provide all information concerning the reason and/or extent of the delay, as well as details relating to the efforts Seller intends to make in order to avoid delay or expedite delivery. In the event of a delay in delivery, the Buyer shall be entitled, without prejudice to any other remedies, to liquidated damages in the amount of 1 % of the order value for each full week of delay, not to exceed a maximum of 10 %. Buyer shall communicate its decision to withhold liquidated damages no later than the date of payment of the first invoice following the delay. Such liquidated damages shall be without prejudice to Buyer's rights to claim for damages related to other aspects of Seller's performance.

4.4 Title to the Goods shall transfer unconditionally to the Buyer upon delivery thereof. Risks will, however, remain with Seller until formal acceptance of the Goods.

### 5. ACCEPTANCE - INSPECTION

5.1 Without prejudice to the terms of Article 4.2, Buyer reserves the right to verify the progress and proper performance of the Order and to conduct any quality investigations and testing it deems advisable. Seller shall provide Buyer and its representatives free access to Seller's workshops at all times. This shall in no way relieve Seller from its duties under the Order, or limit them in any way.

5.2 All requirements mentioned in Buyer's quality systems are to be considered as conditions of the Order itself. Seller shall have an established and implemented Quality System in accordance with ISO 9001 (2000) and TS 16949 (2002) or their equivalent (depending on the nature of the Goods). The Buyer or its representative shall have the right to undertake quality audits and verifications of Seller's or of any subcontractor's quality system.

ARCELOR MITTAL GROUP

5.3 In the event of refusal of all or part of any delivery, Goods rejected shall be stored and shipped back by the Buyer at Seller's expenses and risk.

**6. TECHNICAL DOCUMENTATION - OPERATING AND MAINTENANCE MANUALS**

Seller shall deliver to the Buyer, at such times as may be agreed but at the latest upon delivery of the Goods, all technical documentation relating to the Goods, such as operating and maintenance manuals, training manuals, drawings, technical data sheets, product safety sheets, mill inspection certificates, certificates of conformity and any other supporting documentation. If not otherwise specified in the Order, the delivery of software or of goods including software will include, for maintenance and/or adaptability reasons, all source and object codes relating to it. Such technical documentation, or any special tools in relation to Orders remain the property of Buyer and shall be considered as integral part of Goods in the meaning of these GPC. Notwithstanding anything in this Order or otherwise to the contrary, but subject to Seller's applicable patent rights, if any, Buyer may use and make copies of any Seller's Documents delivered to it under this Order as necessary or reasonably convenient for the purpose of operating, maintaining, repairing, servicing, rebuilding, or modifying any goods delivered to Buyer under this Order or contracting with others to perform any of those services.

**7. WARRANTY - LIABILITY**

7.1 Seller warrants that the Goods shall be in accordance with all agreed specifications and requirements, shall be state of the art and fit for the particular purposes intended by the Buyer, shall be free from defects in design, materials and workmanship, shall satisfactorily fulfill the performance requirements expected by the Buyer, shall meet all applicable statutory requirements and standards, especially those relating to the environment, safety and employment or labor laws and regulations, and shall unless otherwise expressly and clearly specified on the face of the Order be completely new throughout and shall not contain any rebuilt, reconditioned, repaired and/or used parts, components or materials (and in the event it is expressly and clearly stated on the face of the Order that any Goods and/or parts, components or materials may be rebuilt, reconditioned, repaired or used, then any such Goods delivered to the Buyer shall be clearly, accurately and prominently labeled accordingly). Any representations or warranties included in Seller's catalogues, brochures, sales literature and quality systems shall be binding on Seller. Seller warrants the adequacy of the technical specifications of the Order to meet the specific needs of the Buyer, and Seller acknowledges having examined those specifications thoroughly.

7.2 Seller warrants due performance of the Goods for a period of 2 years after they are put into service. Claims made under this warranty shall suspend the warranty period until Seller has remedied the default, and the warranty period will be extended accordingly.

7.3 If any Goods at any time are found not to be as warranted, Buyer shall have the option, by written notice to Seller, at Buyer's sole discretion: (a) to rescind the Order according to the provisions of Article 11 (Termination); (b) to accept such Goods with an equitable reduction in price; or (c) to reject such non-conforming Goods and require delivery of replacement Goods or the making of necessary repairs, at Seller's expense. All Goods rejected for any reason will be returned to Seller, at Seller's risks and expense, or will be stored at Seller's risk in Buyer's warehouses. After 15 days following notification of rejection, Seller shall be liable to pay warehouse storage charges for the Goods.

7.4 If Seller fails to deliver suitable replacements or make repairs promptly or urgently as the case may be, Buyer shall be entitled to replace or repair such Goods through an alternative supplier and recover all related costs from Seller.

7.5 Any Goods repaired or replaced shall be subject to the provisions of this Article, and the warranty period hereunder shall start a new following delivery or repair.

7.6 IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER UNDER THIS ORDER FOR CONSEQUENTIAL, INDIRECT OR SPECIAL DAMAGES, INCLUDING WITHOUT LIMITATION LOST PROFITS, REVENUES, PRODUCTION OR BUSINESS (COLLECTIVELY "CONSEQUENTIAL DAMAGES"); PROVIDED, HOWEVER, THAT FOR PURPOSES OF THE FOREGOING LIMITATION, CONSEQUENTIAL DAMAGES SHALL NOT INCLUDE ANY OBLIGATIONS TO DEFEND, INDEMNIFY OR HOLD HARMLESS OR OTHER LIABILITIES TO WHICH EITHER PARTY HAS EXPRESSLY AGREED UNDER THIS ORDER, WHETHER OR NOT THE UNDERLYING CAUSE FOR EITHER PARTY HAVING TO PERFORM ITS OBLIGATIONS TO DEFEND, INDEMNIFY OR HOLD HARMLESS OR BE LIABLE TO THE OTHER PARTY WOULD OTHERWISE UNDER LAW BE DEEMED TO BE CONSEQUENTIAL DAMAGES.

ARCELOR MITTAL GROUP

7.7 Buyer's rights and remedies as set out in these GPC shall be in addition to any other rights and remedies provided by law.

7.8 In any case, no inspection, approval or acceptance of Goods shall relieve Seller from responsibility for defects or other failures to meet the requirements of the Order.

7.9 Seller warrants to supply the Goods, and parts or components thereof for repair, maintenance or extensions, through the whole period of the Order, including the warranty period, and further warrants that their production or distribution will not be halted. If Seller decides to stop production of all or part of the Goods after the end date of the Order, Seller shall inform Buyer of this fact at least one year in advance, so that the Buyer still has an opportunity to place additional orders.

8. INTELLECTUAL PROPERTY RIGHTS

8.1 Seller warrants that neither the Goods nor the sale thereof covered by the Order will infringe upon or violate any trademarks, patents, copyright or other legal rights of third parties. Seller shall indemnify and hold Buyer harmless against all actions or claims, liability, loss, costs, attorneys' fees, expenses and damages due to or arising from any infringement of intellectual property rights. Seller shall, at its own expense if so requested by the Buyer, defend the Buyer against all such claims, proceedings and suits.

8.2 In the event the Goods become the subject of actions or claims of infringement of intellectual property rights, Seller shall either in the shortest possible period obtain the right for the Buyer to use the Goods or modify or replace the Goods so that the infringement ends. Modification or replacement of the Goods shall never result in a decrease or reduction of the functionality or fitness of the Goods for the particular purpose used by Buyer. If Seller fails to carry out its duties as set out herein, the Buyer, with eight business days advance notice, shall be entitled to take such actions as it deems necessary and to recover the total cost of the Goods from Seller.

8.3 Patentable inventions and protect-able creations as well as their results, insofar as they arise from the Order, shall belong to the Buyer unless Seller establishes that they arise from Seller's sole inventive capacity, and were developed independently of the Order.

9. NON-DISCLOSURE - PROPRIETARY RIGHTS - CONFIDENTIALITY

9.1 All written or verbal information supplied by the Buyer to Seller regarding the Buyer's know how, specifications, procedures, needs and all technical information, documents and data shall be treated as confidential and shall not be disclosed to third parties without the Buyer's prior written consent during at least 10 years following date of disclosure to Seller. Such information shall be exclusively used for the performance of the Order, or for the purpose of preparing offers or quotations.

9.2 The rights of ownership and copyrights in any designs, drawings, samples and other documents delivered to Seller belong to Buyer and such items shall not be duplicated or disclosed to third parties at any time without Buyer's prior written consent.

9.3 Seller shall not take any photographs, videotapes, motion picture or digital images or use any other visual recording devices on any real property of Buyer or its affiliates without, and in each instance where granted, only to the extent of, the prior written approval of Buyer, which may be withheld in Buyer's sole discretion.

9.4 Upon Buyer's request, Seller shall execute any additional agreements regarding proprietary information or trade secrets in connection with this Order as Buyer may reasonably request.

10. FORCE MAJEURE

10.1 The party affected by an event beyond its reasonable control and which could not reasonably have been foreseen or avoided, including (without implying limitation) terrorism, insurrection, epidemic, flood, earthquake or like natural disaster ("Force Majeure") shall immediately notify the other party in writing of said event and furnish the other party with all relevant information and proof relating thereto, and particularly to the period of time said event may delay the timely performance of this Order. Strikes affecting Seller, public transportation or events of any type (including those defined as events of Force Majeure hereunder) affecting Seller's subcontractors or suppliers shall not be considered as events of Force Majeure excusing non performance of this Order.

10.2 In the event of an event of Force Majeure affecting Seller, the Buyer shall be entitled at its discretion:
(a) to agree with Seller on an extension of time for delivery; or

## ARCELOR MITTAL GROUP

(b) to terminate the Order or any part thereof, at any time, without further obligation or liability, and request the reimbursement of any sums already paid.

10.3 The price for shipments previously delivered remains due only if they may be fully used by the Buyer notwithstanding the subsequent failure to deliver the rest of the Order. Any excess amount paid as an advance by the Buyer shall be refunded by Seller.

10.4 Equipment breakdowns, shortage of materials, or any other cause beyond the reasonable control of the Buyer preventing the use of the ordered Goods or reducing the needs of the Buyer with respect to the Goods shall entitle the Buyer at its option to suspend or postpone delivery of the ordered Goods or to terminate in whole or in part the Order without further obligation or liability.

### 11. TERMINATION

11.1 Buyer shall always be entitled, even though Seller is not in breach of any obligation, to suspend the Order for a period determined by Buyer, or to terminate the same in whole or in part, by giving three days' advance notice to Seller. In the event of such a termination, Seller may charge Buyer reasonable costs incurred up to the time of termination relating to the Order. In no event shall Seller be entitled to indemnification for incidental or consequential damages or loss of profits.

11.2 In the event Seller fails to comply with any term or condition of this Order, Buyer shall be entitled, by written notice to Seller and without prejudice to any other remedy, to terminate the Order in whole or in part without any further liability or obligation and to recover from Seller all moneys paid by the Buyer in respect thereof, any additional costs incurred in procuring replacement Goods from an alternative supplier, and indemnification for losses or damages due incurred by the Buyer as the result of any Seller's late performance. The same shall apply in case Seller fails to make progress in producing or assembling the Goods so as to endanger the timely performance of this Order in accordance with its terms. Without prejudice to Article 4, the termination shall be made by registered letter, return receipt requested, fifteen days after the date formal notice of default is given.

11.3 Buyer is entitled to terminate the Order with immediate effect without any further obligation or liability if Buyer has good reasons to believe that Seller will be unable to normally execute its full obligations.

### 12. INDEMNITY

12.1 "Buyer's Indemnitees" shall mean, collectively, Buyer, including any of its affiliated companies, and their respective directors, officers, employees, agents and insurers. "Claims" shall mean, collectively, any and all claims, actions, suits, fines, penalties, and demands (including but not limited to claims of strict liability, negligence, fault imposed by statutes, rules or regulations, breach of contract and breach of warranty) for any liabilities, damages, judgments, awards, costs and expenses of every character whatsoever (including reasonable attorney's fees).

12.2 In connection <u>only</u> with any goods or off-site services provided under this Order, the following shall apply: Seller expressly agrees to defend, release, indemnify and save harmless Buyer's Indemnitees from and against all Claims on account of any loss or damage to property or bodily injuries or disease to persons, including death, occurring in connection with Seller's performance of this Order, except to the extent such injury, damage or loss is due to the negligence of Buyer's Indemnitees or its agents or contractors (other than Seller), provided, however, that, notwithstanding anything to the contrary, the condition or operation of Buyer's Indemnitees' production and manufacturing facilities in the normal course of Buyer's Indemnitees' businesses shall be deemed not to be negligence.

12.3 In connection <u>only</u> with any services provided on Buyer's premises, the following shall apply: Seller expressly agrees to indemnify, defend and save harmless Buyer's Indemnitees from and against any and all Claims on account of any loss or damage to property or bodily injuries or disease to persons, including death, made by Seller or any of its subcontractors or any employee, agent or invitee of Seller or any of its subcontractors by reason of any act or omission, whether negligent or otherwise, including without limitation concurrent, joint, comparative, active or passive negligent acts or omissions, on the part of any of Buyer's Indemnitees or the condition of the job site or other property of any of Buyer's Indemnitees or otherwise; and, to the extent it may relate to Seller's foregoing indemnity of Buyer's Indemnitees for employee injuries, illness, death or damages, Seller specifically waives any Workers Compensation statutory immunity that Seller might otherwise attempt to claim against Buyer's Indemnitees. Seller shall further indemnify, defend and save harmless Buyer's Indemnitees from and against any and all Claims made by any person or persons by reason of

## ARCELOR MITTAL GROUP

any act or neglect on the part of Seller or any of its subcontractors or any employee, agent or invitee of Seller or any of its subcontractors.

12.4 Seller agrees to assume at its expense, on behalf of Buyer's Indemnitees and at Buyer's demand, the defense against any Claim and to pay any amount for which Buyer's Indemnitees may be held liable in connection therewith. If any Claims are brought against any of Buyer's Indemnitees by any person directly or indirectly employed by Seller, or any person for whose acts Seller may be liable, Seller's indemnification obligation to Buyer's Indemnitees shall be absolute and shall not be limited or affected in any way by any Claims or benefits paid or payable by or on behalf of Seller under any Workers' Compensation acts, disability benefit acts or other employee benefit acts. Seller expressly waives any provision of any workers' compensation laws under which Seller could preclude its joinder as an additional defendant(s) or avoid liability for damages, contribution or indemnity in any actions, at law or otherwise, where Seller's employee or employees, its heirs, assigns or anyone else entitled to receive damages by reason of injury or death, makes a Claim against Buyer's Indemnitees. Unless specified otherwise in the commercial terms on the face of this Order, all services provided hereunder shall be deemed maintenance work and not construction work. Buyer reserves the right to retain sufficient funds to cover any Claims that arise before this Order is fully paid.

### 13. INSURANCE

Upon Buyer's request, Seller shall furnish acceptable proof of insurance policies evidencing Workers Compensation and occupational disease coverage, commercial general liability coverage, including both products and contractual liability coverage, employer's liability coverage, motor vehicle liability coverage and any specialty coverage (e.g., aircraft, watercraft, professional services, environmental remediation, explosives) for Seller's goods and/or services, all in amounts reasonably satisfactory to Buyer, but not less than $1,000,000 per occurrence and with insurers reasonably satisfactory to Buyer. The required policies of insurance for commercial general liability, employers liability, and motor vehicle liability shall cover Buyer as an additional insured and shall not have deductibles or self-insured retentions which are greater than the lesser of (i) five percent (5%) of the coverage limit provided by the policy, or (ii) the deductibles or self-insured retentions in Seller's general program of business insurance, unless approved in writing by Buyer. All required policies of insurance shall contain a waiver of subrogation and waiver of liens in favor of Buyer. Seller's insurance coverages shall be primary to and noncontributory with any other insurance carried by Buyer. Seller's provision of required insurance shall not relieve or otherwise limit any of Seller's other obligations or potential liabilities under this Order.

### 14. SUBCONTRACTING

If Seller is authorized to sub-contract all or part of its obligations to third parties, such sub-contracting shall be at Seller's sole expense and under Seller's sole responsibility. Seller shall inform all sub-contractors of the provisions of these GPC as well as those of the Order, and shall provide them with all information regarding the Buyer's requirements, especially in respect of applicable safety rules, Buyer reserving the right to refuse any of Seller's sub-contractors that are not in compliance with these conditions.

### 15. ASSIGNMENT

Seller shall not assign this Order, any rights under the Order or any receivables due from Buyer without the prior written consent of the Buyer.

### 16. JURISDICTION - APPLICABLE LAW

16.1 When no services are to be performed on Buyer's premises under this Order, the laws of the State of Illinois shall govern the validity and interpretation of this Order; when any services are or are to be performed on Buyer's premises under this Order, the laws of the State where Buyer's premises are located shall govern the validity and interpretation of this Order, all of the foregoing without regard to such State's laws concerning conflicts of law. The UN Convention on Contracts for the International Sale of Goods of 1980 shall not be applicable.

16.2 When any services are or are to be performed on Buyer's premises under this Order, the exclusive venue(s) for any legal action brought under this Order shall be the courts of applicable jurisdiction in the State(s) where such services are or are to be provided.

### 17. CODE OF CONDUCT - FRAUD & CORRUPTION

Seller represents that it has read and understand Buyer's "Code of Business Conduct," which is accessible at http://www.mittalsteel.com/Investor+Relations/Corporate+Governance/Code+of+Business+Conduct.htm , and that it have not taken any action inconsistent with or contrary to Buyer's Code of Business Conduct in obtaining this Order. Seller covenants that it shall not take any action inconsistent with or contrary to Buyer's Code of

## ARCELOR MITTAL GROUP

Business Conduct in the performance of this Order. In the event that Seller learns of any violation or alleged violation of Buyer's Code of Business Conduct, Seller shall report the violation or alleged violation by calling the Compliance Hotline Number, which is 1-888-242-7305. Seller shall prevent any fraudulent activity by any of its representatives in connection with the receipt of monies from Buyer. Seller warrants and undertakes that it has not given, and will not give, any gift or commission, nor has agreed, and will not agree, to pay commission to any Buyer's employee, agent, servant or representative in connection with this Order or any other contract with Buyer. If Seller, or anyone acting on the Seller's behalf, is in breach of the foregoing provisions Buyer may (i) terminate the Order and recover from Seller the amount of any loss suffered by Buyer resulting from such termination or (ii) recover in full from Seller any loss sustained by Buyer in consequence of any breach of this Article 17, whether or not the Order has been terminated.

**18. NO LIENS**

All goods and services hereunder shall be delivered and furnished free of all liens, Claims and encumbrances by, through or under Seller ("Liens"). Seller shall pay promptly all Claims and demands for all labor performed and for machinery, fuel or any other material or equipment furnished in the performance of this Order and shall fully defend, indemnify and save harmless Buyer against any Claims or debts on account of which Liens might be obtained and against court costs and reasonable attorneys' fees incurred or sustained by Buyer in discharging any Liens. Buyer reserves the right to use sums otherwise payable to Seller in order to discharge any Liens. Seller shall comply with all applicable laws in the state in which Buyer is located in taking action to protect Buyer against the imposition of Liens. Seller releases and forever waives any and all rights it may have under statutory or common law to assert, file or record any Lien. All right, title and interest (including without limitation any security interest(s)) to and in any of Buyer's property that has been placed into Seller's possession or custody and of any property that Buyer has paid Seller for but has not yet received ("Buyer Property") shall at all times be and remain Buyer's alone, and Seller shall have no ownership or other interest therein. Seller hereby authorize Buyer to prepare and file such Uniform Commercial Code financing statements confirming Buyer's continued ownership of the Buyer Property as Buyer reasonably deems necessary or appropriate to protect its interests. At Buyer's request, Seller shall execute and deliver such instruments as are reasonably necessary in order to fully protect the right, title and interest of Buyer to and in all such Buyer Property. Buyer may, at its option, notify the holder of any lien or security interest in Seller's personal property of Buyer's continued ownership of the Buyer Property. Seller shall segregate all Buyer Property from any other inventory or material in its possession to the maximum extent possible.